IN THE UNITED STATES DISTRICT COURT
OFR THE CENTRAL DISTRICT OF ILLINOIS
AT PEORIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| Vs. ) | Case No. 11-CR-10082 |
| ) | |
| CHARLES W. POLLOCK, ) | |
| ) | |
| Defendant. ) | |

**MOTION TO SUPPRESS**
(Fed. R. Crim. P. 12(b)(3)(C))

Defendant, Charles W. Pollock, by his court-appointed counsel moves to quash the search warrant granted on July 21, 2011 and suppress all items of physical evidence which are alleged to have been seized from the Defendant. In support, the defendant states as follows:

**Facts set forth in search warrant of July 21, 2011**

1. On or about July 21, 2011, Detective Carl Kraemer of the Knox County Sheriff's Department stated, under oath, the facts set forth in the complaint for search warrant. (Attached hereto and marked "Exhibit 1" is a copy of said Complaint for Search Warrant.)

2. Initially, Det. Kraemer sought evidence of a variety of offenses including aggravated criminal sexual assault and violation of the FOID Act. Complaint for Search Warrant ¶1

3. The complaint sought, among others, an "unknown make .45 cal pistol and any and all firearms and ammunition". Complaint for Search Warrant¶1

4. The items to be seized allegedly were on the defendant's person or "at, Victoria, IL or within any and all garages or outbuildings at the above address." Complaint for Search Warrant ¶2.

5. The complaint alleges, among others:

    a. that the defendant kidnapped Ms. Bowyer from her front porch and took her back to his house, restraining her against her will;

    b. that officers responded and saw the defendant and Ms. Bowyer inside the residence;

    c. that Ms. Bowyer claimed to have been forced to engage in sexual activity;

    d. that the defendant suggested to Ms. Bowyer that they go to his garage so that they could commit suicide together;

    e. that Ms. Bowyer stated the defendant had a variety of firearms hidden in the garage and that the guns were previously removed by law enforcement in 2009;

    f. that the defendant threatened to kill a neighbor in 2008;

    g. that the defendant had Ms. Bowyer assist in the removal of guns from his mother's residence in June 2011.

6. Based upon the allegations set for by Detective Kraemer under oath, the court issued a search warrant on July 21, 2011.  (See Attached Exhibit #2)

**Motion to Suppress pursuant to Franks v. Delaware**

7. In preparing the search warrant for submission, Detective Kraemer deliberately, and in reckless disregard for the truth, omitted and misrepresented a variety of facts to the court to obtain a search warrant.

    a. Kidnapping and restraint:

 i. A police report authored by Deputy Gregory Jennings of the events of July 16, 2011 reveals that he and officer Thanh Nguyen were on the scene at the defendant's home. Deputy Jennings saw the defendant and Ms. Boyer through the window and saw that the defendant had his arms around Ms. Bowyer. Initially, Deputy Jennings could not ascertain whether the defendant had his arms wrapped around Ms. Bowyer out of aggression or out of affection. Further, the defendant stood up and fixed the curtains, leaving Ms. Bowyer unrestrained. Detective Kraemer omitted that Deputy Jennings did not report seeing any signs of physical assault, redness, bruising, or the like. In fact, neither Deputy Jennings nor Officer Nguyen saw any signs of a crime at all, let alone kidnapping or sexual assault.

 ii. At trial, Officer Nguyen was asked and testified, "Did you see anything at that house that indicated a crime was going on?" Answer: "No." (Jury Trial at pg 451)

 iii. Deputy Jennings also confirmed this same point at trial:

Q. Did they appear to be mad and fighting?

A. At that time, no.

Q. You didn't see anything to indicate that any laws were being broken, did you?

A. No.

Q. Had you seen anything at all that suggested the law was being broken when you peeked in that window – I didn't mean to say peeked – when you peeked or looked inside that window, would you have taken action?

  A. At that time no.

  Q. So if he was choking her and hitting her in front of the window, you wouldn't have done anything?

  A. At that – if he was choking her and hitting her, I would have forced entry.

  Q. Okay. That was my question. If you had seen anything that indicated the law was being broken or, again, there was an abduction or – or something like that, you would have taken action; isn't that correct?

  A. Yes.

  Q. Instead, you didn't see anything that made you believe that the law was being broken?

  A. Correct. Jury Trial at pg 468 - 469

iv.  Deputy Jennings went on to testify:

  Q. Any indication at all while she was sitting in his lap that she'd been hysterical or upset?

  A. No.

  Q. Did she look pretty calm?

  A. Somewhat, yes. Transcript at pg. 473 – 474.

v.  Officer Jennings was located within two feet of Ms. Bowyer and did not observe any signs of struggle, any swelling, injuries, or any indications of illegal activity. What's more, neither the defendant nor Ms. Bowyer looked upset.

  Q. But you were still within two feet of him?

    A. Yes.

    Q. So you got a real good look at her face, didn't you?

    A. Profile of her face, yes.

    Q. Well, you saw half of it?

    A. Yes.

    Q. You were within two feet of half her face?

    A. Yes.

    Q. And you saw nothing unusual about her?

    A. No.

    Q. Did you see anything unusual about his face?

    A. No.

    Q. Did he look like he'd been crying?

    A. No.

    Q. Did he look angry?

    A. No.

    Q. Did he look upset?

    A. No.

    Q. Did – did Kim Bowyer look hysterical?

    A. No.  Jury Trial at pg. 475-476.

vi. Deputy Jennings telephoned the Knox County State's Attorney, John Pepmeyer by telephone and was instructed not to force entry.

vii. Certainly, any judge would want to know whether officers on the scene observed a disturbance, the apparent physical condition of a purported

kidnapping victim, the apparent state of a kidnapper, etc. These facts were intentionally or recklessly omitted from the complaint for search warrant.

b. Injuries:

   i. Additionally, Detective Kraemer did not note or observe any injuries to Ms. Bowyer such as bruising as a result of being picked up by the throat, missing hair from being thrown into a car, or bruising from being kicked in the face or even bruising as a result of being restrained.

   ii. These facts and reports were known for approximately five days prior to the request for the search warrant and were later confirmed again by trial testimony. On July 20, 2011, Detective Kraemer stated in supplemental report 110003697 that he had reviewed related reports between the defendant and Ms. Bowyer including K11-3563, K11-3697, and K11-3704. The omission of these various facts, among others, was intentionally or recklessly done to deprive the court of all relevant facts and to obtain a search warrant where one would not otherwise be granted.

c. Officers saw Ms. Bowyer:

   i. As stated above, the complaint mentions that officers on the scene saw Ms. Bowyer but Detective Kraemer intentionally omitted the fact that she did not appear to be harmed in any way. In fact, as mentioned above, Deputy Jennings stated that both the defendant and Ms. Bowyer appeared calm.

   ii. Likewise, the complaint fails to mention that Deputy Jennings stood within two feet of Ms. Bowyer and the omission of these facts were

intentionally done to deprive the court of relevant facts and to obtain a search warrant where one would not otherwise be granted.

d. Sexual assault:

   i. Ms. Bowyer wrote two handwritten statements, the first on July 17 and the second on July 18, 2011. In her first statement, Ms. Boyer reported, "Bill picked me up by my neck and hair left off the ground and through me in his car." Ms. Bowyer goes on to say:

   > Grab a hold of me to the house. He sat down the recliner and put me on his lab and wouldn't let me move. The cops showed up he told me not to say nothing to the cops. He took me upstairs. He told me to get on my hands and knees, to make bark like a dog and squeal like a pig. He push me around he kick me with his foot on the side of my head. (July 17, 2011 written statement by Ms. Bowyer.)

   ii. Officers saw no signs physical or sexual assault either on the scene or after.

   iii. In fact, a sexual assault kit was never performed to even verify sexual contact occurred.

   iv. The unsupported inclusion of facts regarding kidnapping and sexual assault while omitting that officers were literally on the scene and officers who took Ms. Bowyer's statement after the fact reported no signs of assault were purposefully done to deprive the court of relevant facts and to obtain a search warrant where one would not otherwise be granted.

e. Suicide and guns:

   i. The complaint states that Bowyer gave a written statement to the Knox County Sheriff's department and one to the Williamsfield Police

      Department. The complaint fails to mention that in the first written statement, even if believed, Ms. Bowyer only states that the defendant wanted to kill himself. July 17, 2011 Written Statement of Kim Bowyer.

  ii. The next day Ms. Bowyer made a second statement and added, "Towards the end of the night he started talking about suicide ask me what I think about going in the garage take his 45 gun put our heads together pulled the trigger to end our life." (July 18, 2011 written statement by Ms. Bowyer.)

  iii. The complaint indicates Ms. Bowyer told police that the defendant "has multiple guns hidden in the garage" and that she had helped the defendant remove guns from his mother's residence. But the complaint goes on to say she carried boxes she "believed" contained pistols and ammunition. Finally, Ms. Bowyer stated that she was aware of cubby holes built into the walls in the garage.

  iv. Again, Detective Kraemer has cultivated a false impression with the court that Ms. Bowyer had seen guns or was actually threatened with guns. In fact, she was not threatened with a gun and had not seen any guns.

f. Finally, Detective Kraemer states that the defendant threatened to kill his neighbor and the neighbor's family in 2008.

  i. The defendant denies that such a threat was ever made.

  ii. However, even if it were true, the report indicates the complaining witness stated he wasn't worried.

  iii. Additionally, there is no context to this report and no indicia of reliability as to the complaining witness, Brodie. This statement was used to bolster

> the notion of the defendant's dangerousness and to inappropriately encourage the court to issue a search warrant.

8. In <u>Franks v. Delaware,</u> 438 U.S. 154, 155-156 (1978), the Court established a procedure for challenging a search warrant affidavit that is alleged to contain materially false statements:

   > Where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.  In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

9. The Seventh Circuit applies the same procedure to cases where it is alleged that material facts have been deliberately or recklessly omitted from a search warrant affidavit.  <u>United States v. McNeese,</u> 901 F. 2d 585, 593-594 (1990); <u>United States v. Kimberlin,</u> 805 F. 2d 210, 252 (1986); <u>United States v. Williams,</u> 737 F. 2d 594, 604 (1984).

10. The Eighth Circuit has held that an officer's factual omission from a search warrant affidavit, stating that a drug detecting canine had shown interest in a package without disclosing that no "alert" had occurred, rendered the warrant invalid and required the suppression of evidence.  According to the Court, the fact that the dog did not "alert" to the package was recklessly omitted, because "any reasonable person would have known that this was the kind of thing the judge would wish to know" in determining whether probable cause existed for the issuance of the warrant.  <u>United States v. Jacobs</u>, 986F. 2d 1231, 1234 (1993).

11. The Ninth Circuit has also weighed in on this issue in <u>United States v. Stanert,</u> 762 F. 2d 775, 781, amended by 769 F. 2d 1410 (1985).  The court stated, "By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw.  To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning."

12. These omissions taken separately and together have provided less than the total story to the court which issued the search warrant.  Moreover, after considering these additional facts, it is clear that probable cause did not exist to issue a search warrant.

**Motion to Suppress based upon lack of probable cause and unreliable informant**

13. The defendant incorporates by reference paragraphs 1 -12 above.

14. The vast majority of statements made by Detective Kraemer in the complaint for search warrant are based upon complaints by Ms. Bowyer.  Unfortunately, Ms. Bowyer is wholly unreliable and her statements are taken at face value and uncorroborated by law enforcement.  In any other context, law enforcement must provide facts supporting the reliability of an informer.  Here there is no corroboration and, if anything, the little investigation that was done seems to contradict the Ms. Bowyer.

15. Beginning with paragraph 1 of the complaint for search warrant, Detective Kraemer states he expects to find "black cloth zippered purse, wallet, driver's license, social security card, FOID, Tompkins State Bank Checks and debit card and miscellaneous items belonging to Kim Bowyer".

    a. However, at trial Ms. Bowyer stated she had her purse and materials back by the end of the week of July 10th, at least one week prior to the search warrant being requested.

Q. You had a purse and a telephone on the evening of the 19th or the day of the 10th, evening of the 9th; is that correct?

A. I had a what?

Q. A purse and a cell phone?

A. – a purse and a cell phone, yes.  Jury Trial at pg. 112.

…

Q. Did you finally get 'em back?

A. Towards the end--.

Q. Were you able to retrieve those things?

A. Yeah, at the end of the week, he dropped it off at – at my house.  Jury Trial at pg. 113.

…

Q. Were they damaged when you got 'em back?

A. No.  I got my purse back.

Q. Was it in good shape?

A. (Indicating.)  Jury Trial at pg. 114.

b. It is concerning and problematic that Detective Kraemer is requesting to search for items that have been recovered one to two weeks before his request.

16. In Paragraph 3 of the complaint, Ms. Bowyer reported to law enforcement that the defendant left her stranded on the roadway after an argument.  This is based upon the statement of Ms. Bowyer made to Deputy Davison on July 10, 2011, Report 110003563.

   a. Officer Davison testified about Ms. Bowyer being left stranded in the road.

Q. Do you recall being on duty on July 10th, 2011?

A.  Yes, I do, Ma'am.

Q.  Where were you patrolling that night?

A.  My – I was patrolling the north car, and so I would be patrolling Wataga, Oneida and up in that area, Victoria and that way.

…

Q.  Do you recall receiving a call regarding a person in the roadway?

A.  Yes, Ma'am.

…

Q.  Who did you find?

A.  Another patrol officer and also myself were in the vicinity, and we found Ms. Kim Bowyers (sic).

Q.  Was she on the roadway?

A.  Well she was on the side of the road.

Q.  What was she doing?

A.  She – when we found her, she was just walking.

Q.  What did you do once you found her?

A.  Well, you know, I – I identified her.  She told me who she was.  She seemed a little upset, and she had been out, I – I believe, and had consumed alcohol that night.

Q.  Okay.  Once you identified her and determined the situation, what did you do?

A.  Well, Kim had – Ms. Bowyers (sic) had – had indicated that her and her boyfriend had been arguing and so he – he dropped her off and at that time told her to find her own way home because they were arguing.  Jury Trial at pg. 405 – 406.

    b. At trial Ms. Bowyer recanted and admitted that she was upset with the defendant because he was flirting with another woman and Ms. Bowyer left the drinking establishment where the defendant was located.   Jury Trial at pg. 79.

    c. Ms. Bowyer then goes on to state that she walked around Wataga, IL for an undetermined period of time, sometime between 9:00 pm and 3:00 am and she knows an old couple, "I was at their house for quite awhile." Jury Trial at pg. 79-83.

17. Also contained in Paragraph 3 is the implication that the defendant stole and/or removed Ms. Bowyer's truck and thereafter damaged it, causing several thousand dollars of damage on or about July 10, 2011.

    a. Ms. Bowyer made a call to 911 on July 10, 2011 at 3:02 a.m. and lasting for approximately five minutes, apparently to report her truck missing.  (See attached exhibit 3)

    b. Ms. Bowyer is then picked up by Deputy Davison on July 10, 2011 at approximately 3:06 a.m. on a call of a person walking in the roadway.  July 10, 2011 Incident report 110003563.

    c. Ms. Bowyer made a second call to 911 on July 10, 2011 at 3:37 a.m. and lasting for 38 seconds.  This begs the question as to how Ms. Bowyer could know that her truck was missing prior to being even being picked up on the side of the road in Wataga by Deputy Davison.

18. Ms. Bowyer reported to officer Davison that "she had had no contact, made no contact with Mr. Pollock from the 10th." Jury Trial at pg. 422.

    a. Ms. Bowyer also apparently reported that she had no contact with the defendant since July 10, 2011 to Detective Kraemer as well. July 17, 2011 Incident report 110003704.

    b. After the defendant allegedly caused thousands of dollars of damage to Ms. Bowyer's truck, she testified at trial:

Q. Now, between the 16th and the 10th—

A. Uh-huh?

Q. – the day he allegedly messed your truck up—

A. Uh-huh?

Q. –to the time he abducted you—

A. Uh-huh?

Q. -- how much contact did you have with him?

A. We talked on the phone Wednesday night or Thursday night. It was one of the nights during the week on the phone. Jury Trial pg. 100 – 101.

    c. Ms. Bowyer then goes on to claim she doesn't remember calling the defendant some 43 times or the defendant calling her or telling officers that she had no contact with the defendant between July 10 and 16. Jury Trial pg. 101- 102.

    d. In fact, Ms. Bowyer stated to Deputy Cheesman that she had text messages with the defendant to determine where the truck was located. See Supplemental Report 110003563.

    e. At trial Ms. Bowyer testified that she did not send text messages to the defendant stating, "I don't know how to text." Jury Trial at pg. 90.

19. It is alleged that Ms. Bowyer is kidnapped and restrained against her will in Paragraph 4 of the complaint.  Ms. Bowyer testified to some of the details of the physical assault including:

Q. Did the [gear] shifter [in the car] hit you in the stomach?

A. It hit me in the mouth.

Q. Oh, it hit you in the mouth?

A. Yeah.

Q. Damage?

A. No.  Just—

Q. Injury?

A. No.

Q. Well, the shifter is hard metal, right?

A. Yeah.

Q. It – it just – I could feel my lip swelling up a little bit.  Jury Trial at 145-146.

…

Q. So he tells you to get out.  You get out of the car.  He tells you to go up to his house, right?

A. Yeah.

Q. Did he have ahold of ya?

A. Yes.

Q. Where at?

A. My Arm.

Q. Which arm?

A. I believe it was the right arm.

Q. So he was holding you with his left hand?

A. I guess. I didn't pay no attention to that. All I know is he grabbed ahold of me and forced me in the house.

Q. Did you have bruises on that right arm?

A. I had bruises all over my left arm.

Q. I said, did you have bruises on your right arm?

A. Some, not as bad as my left. (Jury Transcript at pg. 163.)

…

Q. Now, you just said that Bill kicked you in the head?

A. Uh-huh.

Q. He's a pretty big guy, isn't he?

A. Yes.

Q. Pretty strong guy, too?

A. Yes.

Q. I bet he kicked you hard?

A. (Indicating.) Jury Trial pg. 155

…

20. It strains credulity to believe that all officers involved in the case not only failed to take a picture of Ms. Bowyer's injuries, they also failed to mention observing injuries in any report.

21. Ms. Bowyer wrote in a statement immediately after the alleged sexual assault that, "he wanted to take a shower and for me not to move or he will kill me. After shower he took

to the bedroom laid down.  He told me he will take me home after he sober's up and finally took me home." Written statement of Kim Bowyer, July 17, 2011.

    a. Upon questioning at trial, Ms. Bowyer had a different statement:

Q. Do you recall making a statement to Mrs. – the same one we looked at earlier on July 17th—

A. Uh-huh.

Q. – a statement to Officer Davison?

A. Uh-huh.

Q. And do you recall in there saying that he wanted to take a shower?

A. Uh-huh.

Q. And then after his shower, he took you to the bedroom and laid down with you.  Do you remember saying that?  After his shower, he went to the bedroom and laid down with you?

A. I must not wrote that right.

Q. Pardon?

A. I must not wrote that write (sic) because he didn't take a shower.  Jury Trial at page 190 – 191.

    b. Whether a defendant took a shower on a given night is irrelevant, this is just one more example of Ms. Bowyer changing her story and calling her reliability into question.

22. In fact, both officers on the scene the night of July 17, 2011 testified that they did not see any evidence of a crime being committed.

Q. [Officer Nguyen] Did you see anything at that house that indicated a crime was going on?

A. No.

Q. If you had seen anything that a crime was – would indicate to you that a crime would have been happening or was taking place at the time, would you have taken affirmative action?

A. Yes.  Jury Trial at pg. 451

…

Q. [Officer Jennings] If you had seen anything that indicated the law was being broken or, again, there was an abduction or – or something like that, you would have taken action; isn't that correct?

A. Yes.

Q. Instead, you didn't see anything that made you believe that the law was being broken?

A. Correct.

23. Finally, Detective Kraemer reports Ms. Bowyer claims to have "believed" the defendant removed guns from his mother's house.

    a. Simply put, there is no evidence that Ms. Bowyer saw any guns at any time. What's more, there is no factual basis included in the complaint as to Ms. Bowyer's experience with guns or her basis to know what shoe boxes or bags contained.

**Motion to Suppress based upon overbroad request**

24. The defendant incorporates by reference paragraphs 1 – 23 above.

25. The complaint for search warrant requests to search for a variety of Ms. Bowyer's personal effects as well as anything that "constitutes evidence of, or having been used in the commission of the offense of aggravated kidnapping, aggravated criminal sexual

assault, unlawful restraint, domestic battery, violation of FOID Act and criminal trespass to vehicle."

26. The Fourth Amendment prohibits the issuance of any warrant that does not describe the objects to be seized with particularity. Maryland v. Garrison, 480 U.S. 79, 84 (1987). Failure to specify what items should be seized and where those items are located results in a general warrant and do not comport with requirements of the Fourth Amendment. Andresen v. Maryland, 427 U.S. 463, 480 (1976).

27. A search warrant must have sufficient specificity to enable law enforcement to identify items to be seized with reasonable certainty. United States v. Spears, 965 F. 2d 262, 277 (1992). These requirements of specificity guard against indiscriminant and directionless rummaging of a defendant's home and belongings. United States v. Jones, 54 F. 3d 1285, 1290 (1995).

28. In this case, law enforcement did not know what to look for or where to look for it. Even if law enforcement found a "black zippered purse, wallet, driver's license, social security card, FOID card, Tompkins State Bank checks and debit card and miscellaneous items belonging to Kim Bowyer" these items do not support probable cause to believe that an offense was committed. Ms. Bowyer admitted she had clothes and personal effects at the Defendant's house.

29. Of course this also ignores the fact that these items were found at Ms. Bowyer's house one to two weeks prior to the issuance of the search warrant.

30. Taken as a whole, the search warrant issued is a general warrant prohibited by the Fourth Amendment to the Constitution of the United States.

WHEREFORE, the defendant requests this court enter an order quashing the search warrants ordered on July 21, 2011 and suppressing any and all evidence seized, statements by the defendant and for such other relief the court deems fair and just.

          **/s/ Anthony W. Vaupel**
          **Anthony W. Vaupel**
          **Attorney for the defendant**

### CERTIFICATE OF SERVICE

I, Anthony W. Vaupel, an attorney, hereby certify that on December 10, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the United States Attorney's Office and all CM/ECF participants to:

Tate Chambers, U.S. Attorney Office
Tate.Chambers@usdoj.gov

          **/s/Anthony W. Vaupel**
          **Anthony W. Vaupel**

Anthony W. Vaupel (ARDC# 6276096)
Of Barash & Everett, LLC
Defendant's Attorney
256 S. Soangetaha, Suite 108
Galesburg, IL 61401
Telephone:  (309)341-6010
Facsimile:  (309)341-1945
Email:  tony@barashlaw.com