1                    UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF ILLINOIS
2

3  UNITED STATES OF AMERICA,    ) Docket No. 11-10082
                                 )
4        Plaintiff,              )
   vs.                           )  Peoria, Illinois
5                                )  August 5, 2013
   CHARLES W. POLLOCK, JR.,      )
6                                )
         Defendant.              )
7  _____ )

8
                         RECORD OF PROCEEDINGS
9                         SENTENCING HEARING
             BEFORE THE HONORABLE JAMES E. SHADID
10               UNITED STATES DISTRICT JUDGE

11
                           THE APPEARANCES
12
                        BRADLEY MURPHY, ESQ.
13                     K. TATE CHAMBERS, ESQ.
                       Assistant U.S. Attorneys
14                 One Technology Plaza, Suite 400
                         211 Fulton Street
15                       Peoria, IL  61602
                       On behalf of the Plaintiff
16

17                     ANTHONY W. VAUPEL, ESQ.
                         Barash & Everett
18                     256 S. Soangetaha Rd.
                        Galesburg, IL  61401
19                 On behalf of the Defendant

20

21
                       Nancy Mersot, CSR, RPR
22            United States District Court Reporter
                       100 N.E. Monroe Street
23                       Peoria, IL  61602

24

25  Proceedings recorded by mechanical stenography,
    transcript produced by computer-aided transcription.

2

INDEX

GOVERNMENT'S WITNESSES:                          Page

    Kim Bowyer

Direct Examination                               28

Cross-Examination                                55

Redirect Examination                             65

Recross-Examination                              67

Further Redirect Examination                     69

Further Recross-Examination                      70

Further Redirect Examination                     71

    MATTHEW GALECKI

Direct Examination                               95

Cross-Examination                                99

Redirect Examination                             102

DEFENDANT'S WITNESSES:

    CHARLES POLLOCK

Direct Examination                               77

Cross-Examination                                90

    VERNICE BEGLEY

Direct Examination                               120

    MARK GRABBE

Direct Examination                               122

    JEFFREY AINLEY

Direct Examination                               124

1          (Proceedings were held in open court.)

2          THE COURT:  Thank you.  Please be seated.

3          Good afternoon.  This is the matter of the

4     United States v. Charles Pollock, 11-cr-10082.

5          This matter is set today for hearings on

6     post-trial motions.  If those are heard and denied,

7     then we would move on to sentencing.

8          Motion for a new trial was filed on February

9     18, 2013 by Mr. Vaupel.  And an amended motion for a

10    new trial was filed by Mr. Vaupel on March 1, 2013.

11         Mr. Vaupel, do you wish to be heard any

12    further on those motions?

13         MR. VAUPEL:  Judge, as it relates to the

14    motion for new trial, the only thing that I would

15    add to the motion I have on file is that we had

16    filed two different motions to suppress.  There was

17    a hearing on those motions and, of course, the Court

18    denied those.  I think that we've made our record on

19    that.  But as the appellate court likes to find

20    waiver, in an abundance of caution, I would just

21    orally add those to my written causes in that we

22    feel the Court should give Mr. Pollock a new trial

23    and reconsider its rulings on the two motions to

24    suppress.

25         THE COURT:  Okay.  Mr. Murphy or

1  Mr. Chambers wish to be heard?

2  　　　MR. CHAMBERS:  Your Honor, we understand

3  that the suppression issues are preserved for

4  appeal.  We understand that with respect to argument

5  one, government worked hard to excerpt only those

6  relative parts that were not biased against the

7  defendant showing other bad acts.  The evidence of

8  possession both actual and construction is

9  overwhelming.  The argument about chain goes to

10 weight not admissibility.  And finally the

11 government's closing argument about the slight of

12 hand was directed not towards Mr. Vaupel and his

13 behavior but instead to the argument made by the

14 defense.  And that's a proper argument of the

15 Seventh Circuit, Your Honor.

16 　　　THE COURT:  Okay.  Mr. Vaupel, anything

17 else?

18 　　　MR. VAUPEL:  No.

19 　　　THE COURT:  The Court will respectfully deny

20 both the motion for new trial and amended motion for

21 new trial.  The motions as they pertain to the

22 motions to suppress are made part of the record as

23 well.

24 　　　The jury found Mr. Pollock guilty on

25 February 7, 2013 to three counts of the second

1  superseding indictment, felon in possession of

2  firearms, possession of ammunition by a felon and

3  attempt to temper with a witness by corrupt

4  persuasion.  I believe the verdicts were appropriate

5  and the rulings leading up to them were as well.

6  And therefore the motions are respectfully denied.

7       With that in mind then are the parties ready

8  to proceed to sentencing?

9       MR. CHAMBERS:  The government is, Your

10 Honor.

11      MR. VAUPEL:  Yes, Judge.

12      THE COURT:  Okay.  Parties have received the

13 Presentence Report; is that correct, Mr. Chambers?

14      MR. CHAMBERS:  Yes, sir.

15      THE COURT:  Mr. Vaupel?

16      MR. VAUPEL:  Yes, Your Honor.

17      THE COURT:  There are a number of objections

18 to the Presentence Report that have been made.  The

19 defense has filed a motion -- a sentencing

20 commentary -- sentencing memorandum outlining the

21 defense position and the objections the government

22 has filed and that was on June 19, 2013.  The

23 government has also filed a sentencing commentary

24 responding on July 29, 2013.  Are the parties ready

25 to proceed to take those up?

6

```
 1        MR. CHAMBERS:  The government is, Your
 2   Honor.
 3        MR. VAUPEL:  Yes, Judge.
 4        THE COURT:  Okay.  The first objection
 5   references page 4 through 8, paragraphs 1 through 24
 6   by the defendant.  The defendant continues to deny
 7   guilt to the extent that any of those facts
 8   contained in those paragraphs indicate guilt.  The
 9   defendant denies those facts.  The position of the
10   government and probation officer remain as stated:
11   That these were presented to the jury at trial, and
12   after deliberation the jury found the defendant
13   guilty.
14        So, to the extent that I have ruled on the
15   motion for new trial, and the amended motion for new
16   trial, I will simply check other that the motions
17   for new trial were denied; jury verdicts stand.  Do
18   the parties believe that anything else should be
19   required of that?  That the defendant's position is
20   clear, and we are not going to retry the case to
21   argue it.
22        MR. VAUPEL:  As it relates to the motion for
23   new trial, Your Honor, or for the objections to
24   paragraphs 10, 11 and 12?
25        THE COURT:  Well, you're objecting to
```

1  paragraphs 1 through 24 to the extent that they

2  indicate any kind of guilt, is the way understand

3  it.

4          MR. VAUPEL:  I understand that.

5          THE COURT:  So all I'm saying is that's how

6  we feel we should handle it as opposed to retrying

7  the case here and clearly I think the jury verdict

8  was appropriate, otherwise, I wouldn't have denied

9  the motions for new trial.

10          Okay.  Anything from the government on that?

11          MR. CHAMBERS:  No, Your Honor.

12          THE COURT:  Okay.  Then objection two under

13  -- as stated, references pages 9 and 18 paragraphs,

14  32 and 76.

15          Mr. Vaupel, you object to the base offense

16  level calculated in this paragraph.  You believe

17  that 2K2.1(a)(7) would apply and provide a base

18  level of 12.  You also believe that 2K2.1(b)(1)(B)

19  would apply and 2K2.1(b)(2) would apply and argue

20  that the possession of a firearm and ammunition was

21  for lawful sporting purposes or collection and that

22  would result in a guideline range of 10 to 16

23  months.

24          You further object to the finding that you

25  possessed -- that Mr. Pollock possessed a firearm in

1  connection with any other felony offense.  And to

2  the advisory guideline range established in the

3  Presentence Report which in summary cross-references

4  the matter with Miss Bowyer and asks the Court to

5  find -- make those findings.  Would that be a fair

6  summary and that's really before we get to the next

7  one which references the obstruction of justice,

8  that is what's at the heart of the objections,

9  correct.

10          MR. VAUPEL:  Yes, Judge.  That's fair.

11          THE COURT:  And are the parties ready to

12  proceed on that?

13          MR. CHAMBERS:  The government is.

14          MR. VAUPEL:  Yes.

15          THE COURT:  All right.  Let's proceed.

16          MR. CHAMBERS:  Your Honor, if we may, we are

17  going to bifurcate this and Mr. Murphy will handle

18  the collection issue, with argument and potential

19  witness.  I'll handle the cross-reference issue with

20  both.

21          THE COURT:  Very good.

22          MR. CHAMBERS:  The government will call Kim

23  Bowyer.

24          THE COURT:  Miss Bowyer in the courtroom.

25          MR. CHAMBERS:  She will be in just a moment,

1 Your Honor.

2          (A pause had in the proceedings.)

3          MR. CHAMBERS:  Your Honor, while we are

4 awaiting Miss Bowyer, just for the record, last

5 night when we met to do the pretrial the agent

6 provided me with some trial notes.  Actually this is

7 what the state prosecutor used to prepare herself

8 for the direct of Miss Bowyer.  It's called Kim

9 Bowyer trial prep from the state prosecutor.  Out of

10 an abundance of caution and following the

11 government's complete discovery policy, we have

12 turned that over.  Although it is not a statement of

13 the witness and arguably wouldn't have to be turned

14 over it is something in our possession we just

15 thought better to get it turned over.

16          THE COURT:  Okay.  Very good.  Thank you.

17          Miss Bowyer, would you come forward please

18 and raise your right hand.

19          (Witness sworn.)

20          MR. CHAMBERS:  Your Honor, I also at this

21 time would move if the defense has any witnesses in

22 the courtroom that go to this issue, we would ask

23 that they be excluded.  Character witnesses, of

24 course, we are not asking to exclude them.  But if

25 defendant does have any witnesses with respect to

1  the cross-reference issue, we would ask that they be

2  excluded while Miss Bowyer testifies.

3          THE COURT:  Mr. Vaupel, any?

4          MR. VAUPEL:  No witnesses on this issue,

5  Judge.

6          THE COURT:  Okay.  Very good.

7          Go ahead, Mr. Chambers.

8                      KIM BOWYER,

9  after having been duly sworn, testified as follows:

10                  DIRECT EXAMINATION

11  BY MR. CHAMBERS:

12  Q.  Will you please state your name and spell your

13  last name for the court reporter.

14  A.  Kim Bowyer, B-o-w-y-e-r.

15  Q.  Now Kim, I need you to speak loud enough into

16  the microphone so that everyone can hear you.  Kim,

17  how old are you?

18  A.  Excuse me, I didn't hear you.

19  Q.  How old are you?

20  A.  41.

21  Q.  And you are formerly from this area, correct?

22  A.  Yes.

23  Q.  And do you know the defendant Mr. Pollock?

24  A.  Yes.

25  Q.  When did you first meet Mr. Pollock?  Explain

```
 1  that to the Court and the circumstances under which
 2  you met Mr. Pollock.
 3  A.   It was 2009, my ex-husband and I were --
 4  actually my ex-husband was looking for a part for
 5  his truck and he saw his name on the phonebook for
 6  looking for 0parts for his truck.  So he went over
 7  there to meet him and then when I got off work he
 8  wanted me to meet Bill and his girlfriend Robyn.
 9  Q.   So you went to his residence?
10  A.   Yes, uh-huh.
11  Q.   And when did you meet him the next time?  Tell
12  us the circumstances.
13  A.   It was probably only a couple months after that
14  when my ex-husband and we went over there to meet
15  him again.
16  Q.   And then after that?
17  A.   2010, my ex-husband and I were separated at the
18  time and he left a lot of junk at my house so I went
19  over knowing that he picked up scrap and all of that
20  stuff.  I went over to Bill's house to see if he can
21  get rid of everything that was left behind.
22  Q.   Now when you refer to Bill, you mean the
23  defendant Mr. Pollock?
24  A.   Yes.
25  Q.   So he went over to his house.  What happened?
```

1  A.   We were talking about my ex-husband and I, the
2  reason why we are getting a divorce and all of that
3  stuff, and he said that, yeah, that he would come by
4  like in a week or so to pick up all of his stuff and
5  then he gave me his phone number and asked if we
6  wanted to get together sometime and go out for
7  dinner.
8  Q.   Did you begin a dating relationship with
9  Mr. Pollock soon after that?
10  A.   Yes.
11  Q.   And how long did you date with Mr. Pollock?
12  A.   Fifteen months.
13  Q.   From then to what date?
14  A.   To July 10.
15  Q.   Okay.  And during that time, were you intimate
16  with Mr. Pollock?
17  A.   Yes.
18  Q.   Did you ever -- did Mr. Pollock ever attack you
19  during that time?
20  A.   Yes.
21  Q.   Now I want you to outline for the Court the
22  various -- as best you can -- the various incidents
23  where Mr. Pollock attacked you?
24  A.   September 11 -- I believe it was 2011.
25  Q.   2010?

1  A.   2010, sorry.  We were on his motorcycle and we

2  were -- we went to the bar.  We left.  Got in a big

3  fight.  He pulled over and like a block and a half

4  away from the Farmington bar, people heard me

5  screaming because I guess they went outside, had a

6  smoke or whatever and heard me screaming and he was

7  bashing my face against the brick wall.

8  Q.   What type of injuries resulted as him bashing

9  your face against the wall?

10  A.   I had a fractured eye socket.

11  Q.   Did you seek medical attention for that?

12  A.   Yes.

13  Q.   Were there other instances where Mr. Pollock

14  attacked you?

15  A.   Yes.

16  Q.   Explain that to the Court.

17  A.   Again, going to the bar, riding bike, get in a

18  huge fight; there is a lot of times that he would go

19  up to women and tell them that he wants to lick them

20  all over, you know, just saying obscene to them in

21  front of me and we get in a big fight about that,

22  and then we would come back to his house and he

23  would, you know, verbally, a lot of verbal abuse,

24  call me every name in the book.  Push me.  Shove me.

25  Hit me.  There was a lot of times, because we were

1  going to church for a little while and there were

2  times that I didn't go to church because he didn't

3  want nobody to see the bruises.

4  Q.   Can you estimate for the Court during the 15

5  months how many times Mr. Pollock physically

6  attacked you?

7  A.   Towards the end a lot.

8  Q.   What's a lot?

9  A.   He would choke me.  I would be staying

10  overnight --

11         MR. VAUPEL:  Objection; unresponsive.

12  BY MR. CHAMBERS:

13  Q.   Really, Kim, the question is how often.

14  A.   Okay.  I would say towards the end at least once

15  a week, towards the end of our relationship the last

16  four, five months.

17  Q.   And what would be the nature of the attacks?

18  A.   Mainly drinking.

19  Q.   No, what would he do to you?

20  A.   He would choke me.  He would slap my face.  He

21  pushed me.

22  Q.   Did he ever threaten you?

23  A.   Yes.

24  Q.   Did he ever threaten your family?

25  A.   Yes.

Q.   Tell the Court how he threatened your family.

A.   He told me that he was going to take care of
everybody and save me for last.  He was going to go
down and kill my mom, that was easy to do, he said.

          MR. VAUPEL:  Objection; foundation.

          MR. CHAMBERS:  Your Honor, the rules of
evidence do not apply to sentencing hearings.

          THE COURT:  Overruled.  Just try to narrow
some timeframe for us please.

BY MR. CHAMBERS:

Q.   During the course of these 15 months, how many
times did he threaten to kill your mom?

A.   One time.

Q.   Do you remember approximately when that
happened?

A.   That was July 16.

Q.   What other threats did he make against your
family?

A.   He threatened to have, how he put it, his nigger
friends from Chicago to kidnap my oldest daughter,
to prostitute her out, and then he threatened to --
if I didn't listen, do what he wanted me to do, he
was going to take me back to my house and tie me up
and rape my 16-year-old daughter, my second
daughter.

1  Q.   Did he ever talk to you about having sex with

2  your 16-year-old?

3  A.   Yes.

4  Q.   Tell the Court.

5  A.   He wanted to have a kid with her.  He said that

6  she was healthy and he knew I was not going to have

7  anymore kids and I told him stop talking nonsense

8  like that; I don't want to hear crap like that at

9  all.

10 Q.   Was there an incident in St. Charles?

11 A.   Yes.

12 Q.   Where there was an attack?

13 A.   Yes.

14 Q.   Approximately when did that happen?

15 A.   That was exactly a week before the other

16 incident in Farmington, September 11th, when he

17 fractured my eye socket.  He wanted to go to a

18 different bar.  He likes to go to a little more

19 rowdier bars and stuff.

20 Q.   Why were you in St. Charles?

21 A.   My daughter was having a beauty contest pageant.

22 Q.   Tell the Court what happened.

23 A.   We went over to this bar, and he -- of course he

24 is always calling me names and that.  The lady

25 bartender -- well, before he went to the bathroom,

1  he told me don't talk to nobody here.  I said I know

2  the routine, I know; I'm not going to talk to

3  nobody; I'm just going to look at the TV and that.

4  So he is like I mean it, don't talk to nobody.  I'm

5  like I know.  So he went to the bathroom.  Shortly

6  after he went to the bathroom, the lady bartender

7  comes to me, she goes, why do you put up with that,

8  the way he talks to you.  There was a guy across the

9  room --

10          MR. VAUPEL:  Objection.

11          THE DEFENDANT:  It's hearsay.

12          MR. CHAMBERS:  I don't know what the

13  objection is, Your Honor.

14          THE COURT:  Hearsay.

15          MR. CHAMBERS:  The defendant said hearsay.

16          THE COURT:  Oh.

17          THE DEFENDANT:  It is hearsay.

18          MR. VAUPEL:  Judge, this is irrelevant what

19  other people might have said or commented to her at

20  the bar.

21          MR. CHAMBERS:  Your Honor, it is not

22  irrelevant.  In fact the defendant in his objection

23  says that there is no evidence that he's ever been

24  abusive to her in the past.  This is providing that

25  evidence to the Court.  Hearsay rules don't apply in

1  sentencings.

2       MR. VAUPEL:  But Miss Bowyer's testimony

3  what a bartender or some other employer at some

4  place in St. Charles is not evidence of whether or

5  not this happened.

6       THE COURT:  Sustained as to that effect.

7  Let's move on.

8  BY MR. CHAMBERS:

9  Q.   What happened next?

10  A.   So this guy came around, set right next to me

11  and I'm looking at her because I didn't want to look

12  at him just in case Bill came out of the bathroom

13  thinking that I'm talking to him and I'm telling him

14  go back to where he came from, you know, Bill will

15  get really, really mad; you just need to go back.

16  And he is yelling at me saying you need to get away

17  from a guy like this.

18  Q.   What happened next?

19  A.   Right in the middle of that conversation, next

20  thing I knew Bill grabbed ahold of the back of my

21  hair, yanked me off the bar stool and dragged me by

22  my hair up to the bar and these guys were trying to

23  get him off of me.  At that time a lady bartender

24  says the cops are on the way.  We left before the

25  cops got there.

Q.   Did you ever see Mr. Pollock lose his temper and
do other violent acts?

A.   Yes.  I have seen him when he gets mad.  He will
punch the windshield in his junk cars that he had
out there.

Q.   Kim, the question is with this type of abuse,
why did you continue to have a relationship with
Mr. Pollock?

A.   I was scared, very confused.  He threatened if I
ever left that he was going to come after me and my
girls, my mom.

Q.   Let's now go to July 9th, 2011, what happened on
that -- this is the incident where you are left at
the tavern?

A.   Okay.  That night he wanted to go to Galesburg
to get some pot and he met up with some friends.
There was like four or five of them.  And we ended
up going to a bar over in Oneida, I think it is
called, outside of Galesburg, called Country, and we
were there playing pool.  There was quite a few
people in there and a couple girls came back there
and they were hooting and hollering, and again, he's
always flirting with these women saying comments
that, you know, that he wanted to fuck them, lick
them, and all of this other crap.  And I've told him

1  so many times I'm so tired of going places like this

2  and you are saying this stuff in front of me; it is

3  just not right.  So I decided I'm going to start

4  sitting outside and not even deal with it, not even

5  hear it.  So I went outside, set on the curb.  He

6  was in there for quite a while.  So I went for a

7  walk just to get away.  And then I came back and he

8  was not there.  So then I went over to people's

9  houses knocking on the door trying to find a ride to

10  get back to his house so that I could get my truck

11  and go home.

12  Q.   What happened next?

13  A.   Somebody, I think one of the people that I

14  stopped by, somebody called the cops and I ended up

15  meeting that cop right off -- I don't even know the

16  name of the back road, but the main road going to

17  his house.

18  Q.   What happened next?

19  A.   It was Officer Denny and he knew that we were

20  both drinking and fighting, and I asked him can you

21  please just take me to his house so that I can get

22  my truck and go home.  He said that I cannot do

23  that; you guys have been drinking and fight -- you

24  guys need to stay clear from each other for 24

25  hours.  And I told him, I said, well, I need to get

1  my truck, you know, because he's threatened me in

2  the past that he was going to damage my truck, and

3  he says, I cannot take you -- I said, well I'm

4  letting you know that when I get home and my

5  daughter is home I'm going to have her take me to

6  his house so that I can get my truck.

7  Q.   What happened next?

8  A.   He told me, he says, if there is any damages,

9  any problems, just make sure you call 911.  So I

10 did.  I went over there.  My truck was not even

11 there.  It was gone.

12 Q.   Okay.

13 A.   So then we were coming back to my house and call

14 911 and told them the whole situation, that my truck

15 is not there.

16 Q.   Did you hear from Mr. Pollock the next day?

17 A.   Yes, the next morning.

18 Q.   Tell the Court about that.

19 A.   He just bragged about that I just destroyed your

20 truck.  He said, something you loved so much, I

21 destroyed your truck.  He says, I should have just

22 threw it all way down into the river.  I'm going,

23 where is your truck.  He says that you will figure

24 it out.  I said just tell me where my truck and I

25 will just leave you alone.  He is like you will

1 figure it out.  He says that I guess I should have

2 put more sugar or salt or something in the gasoline

3 and pushed it all the way in the river but your

4 truck is damaged.

5 Q.   Did you ever find your truck?

6 A.   Yes.

7 Q.   Where did you find it?

8 A.   About halfway from my house to his house.

9 Q.   And when you found it, what condition was it in?

10 A.   The back end of the passenger side.  It was all

11 bashed in.  My mirrors were all broken in.  My door

12 was all messed up.  I couldn't even really -- I had

13 to go through the passenger side to get in and out

14 of it.  My tires were flat.

15 Q.   Did you take it to an auto body to find out how

16 much it would take to repair it?

17 A.   Yes.

18 Q.   What were was the costs?

19 A.   They told me almost $9,000.

20 Q.   After this, July 10, 2011, did you have contact

21 with Mr. Pollock that following week, phone contact?

22 A.   Phone, yes.

23 Q.   What was the nature of those phone calls?

24 A.   Back and forth, hanging up on each other.  We

25 weren't on the phone that long.  Mostly yelling and

1  screaming at each other.

2  Q.   Sat, July 16, did you, in fact, meet

3  Mr. Pollock?

4  A.   Yes.

5  Q.   Tell the Court how that came about?

6  A.   He wanted me to meet him over at Lafayette bar.

7  He was going to have dinner over there.  He wanted

8  to talk about the damages of the truck.  He said

9  that he found somebody in Lafayette that has an

10  identical truck like me that he was going to take

11  the truck bed off of that one and put it on, you

12  know, replace it with mine and then replace

13  everything -- that was it was an identical truck.

14  Q.   Did you go to dinner?

15  A.   I went there but I didn't eat or anything.

16  Q.   What happened at the dinner?

17  A.   He wanted to keep talking about that and

18  apologized what he did to the truck and everything.

19  I said, I'm taking off.  I'm going to my mom's for a

20  week.  And he pretty much, he wanted me to stay, and

21  I'm like, no, we are packed up, I'm packed up, I'm

22  waiting for Shandel to get packed up.

23  Q.   Who is Shandel?

24  A.   My daughter.

25  Q.   So what happened next?  Where did you go?

24

1  A.   I went home.

2  Q.   Then what happened?

3  A.   A few hours later he came by, storming up in the

4  driveway, and he was just, you know, belleviated

5  (sic), just yelling and screaming because I knew he

6  was drinking all day because he was pretty sloshed

7  when I seen him about 3:00 or 4:00 at Lafayette bar.

8  He says that he hadn't been eating that much the

9  last few days since the truck accident.  He hasn't

10 been eating or sleeping much.  He has just been

11 drinking a lot.

12 Q.   Tell the Court what happened.

13 A.   When he pulled up in the driveway, my daughter

14 just got done packing up her things.  She was

15 sitting on the deck with me.  I was on the phone

16 talking to my mom.  Bill kept on me calling me

17 because I had call waiting on my cell phone and kept

18 calling me and calling me.  My mom was saying, Kim,

19 you need to get out of there; you and Shandel need

20 to leave now.  She says, I just feel that something

21 bad is going to happen.  She said, I told you that

22 he is going to kill you --

23 Q.   What happened, Kim?  Tell the Court what

24 happened.

25 A.   I was going into details.  He -- my daughter and

 1  him got into a big fight, and we were both yelling
 2  at her to get into the house because she was saying
 3  he was not wanted here no more that you are not -- I
 4  don't want you by my mom; you are not wanted here.
 5  And I was afraid that he was going to, you know, how
 6  mad he was getting as she was yelling at him.  I was
 7  afraid that he was going to smack her.  So I yelled
 8  at her "get in the house" and finally he did too as
 9  well, he told her to get into the house, shut the
10  fuck up, get into the house.  And shortly after I
11  still had my phone on with my mom and he grabbed
12  ahold of me by my neck and my shoulders and lifted
13  me up.  My phone flinged.  He threw me into the
14  driver's side and he already had the passenger side
15  door already locked.  And he says no funny business,
16  and then shut the fuck up, you know, just shut the
17  fuck up.  That's all I just kept on hearing.  We
18  stormed out of the driveway going back to his house.
19  He is hitting his ceiling of the roof of the car and
20  his dashboard and all of that stuff.  Call me every
21  name you can imagine, whore, everything, everything,
22  and I just started crying.  I didn't know -- I've
23  seen him mad before but he was really, really mad
24  when he got me.  So when we got to his house, he
25  says, get out of the car.  I said, no, I don't want

1  to, and he is like get out of the car.  I said no, I

2  just want to stay here, just leave me alone.  And he

3  is like get the fuck out of the car, so he ended up

4  getting out of the car and drag me by my hair up to

5  -- throughout the grass and everything.  I said,

6  okay, okay, okay, stop dragging my hair.  I will

7  walk.  I will go in your house.

8  Q.   Kim, did you voluntarily get in his truck to go

9  to his house?

10 A.   His car, no.

11 Q.   Did you get in his car to go to his house?

12 A.   No.

13 Q.   Okay.  Did he force you into the car?

14 A.   Yes.

15 Q.   Did he forcibly take you to his house?

16 A.   Yes.

17 Q.   Okay.  Now he is dragging you across the yard.

18 You are now walking.  Tell the Court what happens

19 next.

20 A.   We get in the house.  He locks up the door and

21 then he start cussing out my daughter, I bet your

22 cunt daughter is probably calling 911 right now.  He

23 said, I am assuming the cops will be here soon.  He

24 said, I went through this before with Robyn and all

25 of that.

1  Q.  Who is Robyn?

2  A.  His ex-girlfriend.

3  Q.  Okay.  Go ahead.

4  A.  And then he told me to sit on the reclining

5  chair, which I did, and he is pacing back and forth,

6  just calling me all of the names.  He says, I know

7  that the cops are coming.  He says, your stupid

8  daughter.  He just kept repeating himself over and

9  over and over.  When the cops did finally show up,

10  he got me up, put me on his lap and straddled me

11  like a baby.

12  Q.  Explain that to the Court.  He is sitting in the

13  chair?

14  A.  Uh-huh.

15  Q.  How are you positioned?

16  A.  I was sitting on his lap and --

17  Q.  Facing him?

18  A.  Facing -- it is like -- okay, say he is right

19  behind me and I was like this and he had me in a

20  hurdle, in a baby hurdle.

21  Q.  In a what?

22  A.  In like a baby hurdle.  He had my knees clear up

23  to my face where I couldn't hardly breathe.

24  Q.  Are the police knocking on the door?

25  A.  They are banging on the door.

Q.   What is he saying to you?

A.   Shut the fuck up.  Don't say a damn word, if you

say a word, I will break your neck right now.

Q.   Tell the Court what happened.

A.   He just kept on over and over and over just

telling me to be quiet, don't say a word.  No funny

business.  And then he says we are going to sneak up

the stairs.

Q.   Were the lights off inside?

A.   The lights were off upstairs but in the living

room that was the only light that was on.

Q.   What happened next?

A.   We walked up the stairs and then he pushed me on

to the bed.  He says don't move, don't say a word

because this bedroom windows were open because I

could hear the cops, you know, talking to each other

among each other and everything.  He says eventually

the cops will leave, he said, I went through this

before, they will come, bang on the door for a while

then they will leave.  And I'm thinking in the back

of my head, oh, my God I hope to God they don't.

Then eventually they did, he was right.  I was just

laying there and I was just like I can't believe

they left me here, you know, and with his state of

mind.  I just couldn't understand it.  And he kept

1  on asking me, what's wrong with you, what's wrong

2  with you.  I just went numb.  I was just scared, so

3  scared how he was.

4  Q.   What happened next?

5       THE DEFENDANT:  Come on.  This is nothing

6  but a lie.

7       THE COURT:  Mr. Chambers, just keep

8  examining the witness please.

9  BY MR. CHAMBERS:

10 Q.   What happened next?

11      THE DEFENDANT:  There are no tears.

12 BY THE WITNESS:

13 A.   He told me to get on my knees.

14 BY MR. CHAMBERS:

15 Q.   Did you make a phone call?

16 A.   Yes, yes.

17 Q.   Before you were forced on your knees?

18 A.   Yes, he wanted me to call up Shandel to tell her

19 everything was all right.

20 Q.   Okay.  Tell the Court how that phone call went.

21 A.   She was hysterical.  I was trying to get her

22 calmed down and everything.

23 Q.   Where did you get the phone call?

24 A.   On his cell phone.

25 Q.   Okay.  So you called your daughter on his cell

1  phone.  Tell the Court what happened.

2  A.   Like I said, she was hysterical, and I was just

3  telling her everything is all right.  He was still

4  in the room at the time and he said he was going to

5  go downstairs to get another can of beer and then

6  right when he started going down the stairs, I was

7  telling her, call 911 again, things are not right

8  here, things are getting really bad.  She was like

9  I'm going to come.  I said, no, you're not going to

10  come.  I said do not come.  I said anybody should

11  come.  If you can't get ahold of the cops, get

12  Mike's neighbor, have him bring a gun and have him

13  come because I was scared to death.  I didn't know

14  what was going to go on.  And then by the time I was

15  telling her all that he came back up the stairs.  He

16  heard part of the conversation and he kicked the

17  side of my head and the phone flinged, and then I

18  got really sick to my stomach, really dizzy.

19  Q.   After he kicked you to the side of the head,

20  what happened next?

21  A.   Shortly after that he told me to get on my

22  knees, put my hands behind my back and he wanted me

23  to start barking like a dog and squealing like a

24  pig.  He says now you're going to start listening to

25  me when I'm telling you what to do.

1  Q.   Did he demand oral sex at that point?

2  A.   Yes.

3  Q.   Tell the Court what he said?

4  A.   He told me to suck my cock, suck my cock, you

5  fucking bitch.

6  Q.   Did he force you to do it?

7  A.   Yes.

8  Q.   Tell the Court how he forced you?

9  A.   He put his hand behind my head and then just

10 pressed against me.

11 Q.   Did he make any additional threats against your

12 daughter?

13 A.   Just like I said he threatened to come back, tie

14 me up and take me back to the house and he was going

15 to rape her over and over and over; that he promised

16 me that he was going to screw my head up like he

17 screwed up Robyn's head.

18 Q.   What happened next?

19 A.   After he did that, he was acting like he was

20 going to get on the phone and he said that he was

21 going to get ahold of his nigger friends to take

22 care of my oldest daughter to kidnap her and

23 prostitute her out and that you would never see your

24 daughter again.

25 Q.   What happened next?

1  A.   He wanted to have sex, and I told him I didn't

2  want no sex.  I said, I'm too upset.  I don't want

3  no sex.  My head was throbbing.  He actually gave me

4  that cold beer can and put it on my head because I

5  was just so light-headed getting headaches and all

6  of that stuff and he just said, I want to have sex,

7  damn it, girl, I told you you're going to listen to

8  every word I say.  You are going to do what I tell

9  you.  Then every time I refused, he says, well, I'm

10 going to get ahold of my nigger friends and I'm

11 going to get this taken care of and your mom will be

12 easy to get taken care of.  Then I got really scared

13 because then I am like, okay, he is for real about

14 all of this stuff, that's when I said that I will do

15 whatever you want me to do.

16 Q.   What did you do?

17 A.   I ended up having sex with him.

18 Q.   After he climaxed, what happened next?

19 A.   He started finally calming down.  Started

20 talking -- he was getting really depressed and he

21 was talking like suicide depressed and he thought

22 about -- he goes maybe we should just go out to the

23 garage and put our heads next to each other and get

24 my 45 out and blast our brains out.

25 Q.   Kim, did he climax inside of you?

1  A.    Yes.

2  Q.    Did he say anything to you about the evidence

3  that you would have against him if you decided to

4  prosecute him?

5  A.    Yes.

6  Q.    What did he say about that?

7  A.    He says, you've got one hell of an alimony

8  (sic).  He says, you got DNA.  I'm sure that they

9  will fingerprint the truck.  You got your daughter

10  as a witness that he took me.  He says, you got one

11  alibi.  He says, we might just end it had now.  He

12  started getting into ending our lives together.  He

13  just went over and over and over with that and I was

14  trying -- at that time I was just trying to comfort

15  him saying, no, you don't want to do that.  You

16  know, you can go to jail for a long time doing

17  something like that.  You don't want to do that.

18  Q.    What did, tell the Court again what he said to

19  you about the 45?

20  A.    He says that we should go out to the garage and

21  he had a 45 hidden out in the garage somewhere and

22  put our heads together and blast our brains out, one

23  shot.

24  Q.    Did he feel threatened by the defendant?

25  A.    Yes.

1 Q.   Did you think you were going to die?

2 A.   Yes.

3 Q.   Why do you think he told you -- what was your

4 understanding of why he told you about the 45?

5 A.   I don't understand.

6 Q.   Why did he say that to you?

7 A.   I don't know.

8 Q.   Did he express a concern about you reporting the

9 kidnapping and the rape to the authorities?

10 A.   Yes.

11 Q.   How many times did he suggest to you that he was

12 going to take you out in the garage and put a 45 to

13 your head and blow both of your heads off?

14 A.   That one time.

15 Q.   Now, did you know him to have guns?

16 A.   Yes.  I knew that he had guns at his mom's

17 house; he told me.

18 Q.   You knew they came from the mom's house?

19 A.   Yes.

20 Q.   You helped him carry those?

21 A.   Yes.

22 Q.   Kim, after this was over, did you get

23 counseling?

24 A.   Yes.

25 Q.   Why?

A.   Because I was getting night terrors where I
would literally be in a dead sleep and get up
running full force and I run into a wall thinking
that he is chasing after me because he was always
chasing after me.  It seems like I always tried to
get away and he's always chasing me.

Q.   After you convinced him not to end your life
with the .45 shell, did he eventually take you home?

A.   Yes.

MR. CHAMBERS:  If I could have just a
moment, Your Honor.

BY MR. CHAMBERS:

Q.   Kim, were any of the sex acts, the oral sex or
the actual intercourse, with your consent?

A.   No, I told him I didn't want sex.

Q.   He forced you?

A.   Yes.

Q.   And you did feel threatened by the 45 comment?

A.   Definitely, yes.

Q.   After you left, did you report this to the
authorities?

A.   Yes.

Q.   Tell the Court how that happened.  He takes you
home.

A.   He takes me home and I'm banging on the door for

1  Shandel to unlock the door, and I told her just go,

2  let's just go, we will call the cops on the way.

3  And she is like let's call now.  I said I ain't

4  staying here.  He will come back here.  He will come

5  after both of us; we are leaving now.  So after we

6  went down the road a ways -- I can't even remember

7  now if she did or I did -- I was hysterical then.

8  Q.   What happened next?

9  A.   I ended up meeting Officer Denny halfway by the

10 road by the golf course over by 150.

11 Q.   Immediately after you got home?

12 A.   Yes.

13 Q.   You mentioned earlier that Shandel went back to

14 the house.  Did you and Shandel have a safety plan

15 worked out in case he showed up at the house?

16 A.   Yes.

17 Q.   Tell the Court what Shandel was to do if he ever

18 showed up at the house.

19 A.   If he --

20      MR. VAUPEL:  Objection; relevance.

21      THE COURT:  Mr. Chambers?

22      MR. CHAMBERS:  Your Honor, it goes to the

23 nature of the violent acts that he committed at the

24 house during the kidnapping.  It shows that they

25 executed the safety plan.

```
 1         THE COURT:  All right.  Go ahead.
 2  BY THE WITNESS:
 3  A.   If he ever shows up, banging on the door either,
 4  whatever, she has a bedroom window facing south.  I
 5  told her to go to that -- go through that window and
 6  there is a neighbor diagonal across from us because
 7  he knew the situation; he was always scared for us.
 8  And to run over there to call for help and you stay
 9  there until somebody was there when the cops were
10  there.
11         MR. CHAMBERS:  Your Honor, those are my
12  questions.
13         THE COURT:  Mr. Vaupel.
14              CROSS-EXAMINATION
15  BY MR. VAUPEL:
16  Q.   Ma'am, you said that Mr. Pollock beat you
17  throughout the 15-month relationship?
18  A.   Not through the -- towards the end.
19  Q.   And that you were afraid to leave him?
20  A.   Uh-huh.
21  Q.   As a matter of fact, he had broken up with you
22  during the course of the relationship, right?
23  A.   No.  We broke up July 10th, June 9th, whatever
24  the incident with the truck because I was done with
25  that.
```

1  Q.   So he hadn't broken up with you and then went to

2  Florida?

3  A.   He went to Florida but we did not break up.

4  Q.   Then you followed him to Florida?

5  A.   Yes.  He wanted me to.  He had all of his

6  friends call me up saying that he is so sorry about

7  everything, that they all wanted me to more work

8  things out.  He had two friends; one friend in

9  Chicago and another friend that lives outside

10  Williamsville.  Even his mom called me up saying

11  that, you know, we would like --

12  Q.   There is no question pending here.

13       MR. VAUPEL:  Judge, could I have just one

14  minute here?

15       THE COURT:  You may.

16  BY MR. VAUPEL:

17  Q.   Let me come back to this point in just one

18  minute here.  Now you said that he called you and

19  told you that he had done something with your car?

20  A.   Yes.

21  Q.   Do you remember telling anyone previously that

22  you hadn't talked to Mr. Pollock in, I think it was

23  ten days, between being dropped off of the back of

24  his motorcycle, and then ten days after that?

25  A.   I don't recall that.  I just know he called me

1 the next day telling me figure it out where my truck
2 is at and that he destroyed it, that he put a lot of
3 damage into it.
4 Q.   So you don't remember telling Deputy Cheesman of
5 the Galesburg Sheriff's Department that the two of
6 you haven't had any phone contact in those ten days?
7 A.   We had phone contact, but not contact, not
8 physical.
9 Q.   So my question is, you don't remember telling
10 Deputy Cheesman that the two of you hadn't had phone
11 contact?
12 A.   No, I said that we had phone contacts but not
13 physical.
14 Q.   So Deputy Cheesman would be wrong?
15 A.   Must have misunderstood or something, but I do
16 know we had phone contact.
17 Q.   And do you remember telling, I believe it was
18 Deputy Davidson, that Mr. Pollock had kicked you out
19 of his car that night on the side of the road?
20 A.   The night on the motorcycle or what night are
21 you talking about?
22 Q.   Well, this night that the two of you went to
23 Wataga, right?
24 A.   Okay.
25 Q.   And you saw Mr. Pollock talking with a couple

1 other women?

2 A.   Yes.

3 Q.   And you got mad?

4 A.   Yes, and went outside.

5 Q.   And you left, right?

6 A.   Sat on the curb.

7 Q.   And you were gone for some four or five hours,

8 right?

9 A.   I went walking around for a while and then I

10 came back, didn't see him in the bar so I thought he

11 left.

12 Q.   And then so you started walking home?

13 A.   I was thinking about walking home, I'm like, no.

14 I'm going to start knocking on people's doors, so I

15 started knocking on people's doors.  The first

16 couple they didn't want no part of that because they

17 knew there was, you know, because I told her there

18 was some violence and verbal and all of that

19 stuff --

20 Q.   That is 1:00 or 2:00 in the morning, right?

21 A.   I don't know the time; I didn't have a watch.

22 Q.   Could it have been 3:00 in the morning?

23 A.   I don't know.

24 Q.   So after knocking on people's doors --

25 A.   Doors.

1 Q.   -- for a couple hours then you started walking?

2 A.   Yes.

3 Q.   And that's when Deputy Davidson picked you up?

4 A.   Yes.

5 Q.   And you remember telling Deputy Davidson that

6 Mr. Pollock kicked you out of the car, right?

7 A.   No, we were in the bar.

8 Q.   You told Deputy Davidson that Mr. Pollock kicked

9 you out of the car, correct?

10 A.   No, that was a different time.  That happened

11 over on the other side of Brimfield, that other

12 incident.

13 Q.   Do you remember testifying at this trial --

14 A.   Yes.

15 Q.   -- that you told Deputy Davidson that

16 Mr. Pollock left you on the side of the road?

17 A.   He left me at the bar or left me there, I should

18 say.

19 Q.   That's not my question, ma'am.  Do you remember

20 testifying that you told Deputy Davidson that

21 Mr. Pollock left you abandoned on the side --

22 A.   He did leave me because he was not at the bar.

23 I came back.  I went for my walk.  He was not at the

24 bar.

25 Q.   So it is your testimony here today that you

1  never told Deputy Davidson that Charles left you on

2  the side of the road?

3  A.   He left me.  He left me there.  That's why I was

4  trying to get a ride back to his house.

5  Q.   Ma'am, if the truth is just yes or no, would it

6  be okay if you just answered yes or no?

7  A.   I'm telling you what I know, what I remember.

8  Q.   Did you testify that you told Deputy Davidson --

9  A.   He left me.

10 Q.   -- Mr. Pollock left you on the side of the road?

11 A.   He left me.

12 Q.   So the answer is no, you didn't say that?

13 A.   All I remember is he left me there; he was not

14 there.

15 Q.   Do you remember testifying at the state court

16 trial that you hadn't had phone contact?

17 A.   We had phone contact.

18 Q.   So the answer would be no?

19 A.   No physical contact.

20 Q.   Okay.  And then do you remember on

21 cross-examination with Mr. DeWolf?

22       MR. CHAMBERS:  Your Honor, could we have a

23 page site?

24       THE COURT:  Mr. Vaupel?

25       MR. VAUPEL:  I don't have one.

1          THE COURT:  Okay.  Go ahead.

2          THE DEFENDANT:  I have it.  What would you

3  like --

4  BY MR. VAUPEL:

5  Q.   Do you remember testifying on cross-examination

6  with Mr. DeWolf and that's when you told Mr. DeWolf

7  on cross-examination then that you had communication

8  with Mr. Pollock?

9  A.   With the phone, yes.

10          THE DEFENDANT:  Page 202, Tony.  If you want

11  to tell him it is page 202.  It is on page 202 and

12  actually where she said that she called me 43 times.

13  We talked for 15 minutes at a time.

14  BY MR. VAUPEL:

15  Q.   Now on the night of going to Wataga, had you

16  been drinking that night?

17  A.   Yes.

18  Q.   On the night of going to St. Charles had you

19  been drinking that night?

20  A.   Yes.

21  Q.   And did you press charges for Mr. Pollock

22  pulling you off the bar stool by the hair?

23  A.   No.

24  Q.   And I guess this week before thing, where was

25  that supposed to have been at?

1  A.    In Farmington?

2  Q.    In Farmington.   You pressed charges there?

3  A.    I was going to put a restraint order on him

4  then.

5  Q.    But you didn't?

6  A.    I did at the beginning of it but I didn't go

7  back and do the two week one or the two year one,

8  I'm sorry.

9  Q.    Then finally isn't it true that on this date in

10  July of 2011 when you said Mr. Pollock threw you in

11  the car, isn't it true that you sat in the car and

12  wouldn't get out of the car?

13  A.    He told me "don't move," "don't do no funny

14  business," "don't try to jump out."   He had my door

15  locked already when I got in there.

16  Q.    Isn't it true that when he drove back to his

17  house he walked in and you followed him in without

18  him putting his hands on you at all?

19  A.    No.  He came around, because he wanted me to get

20  out of the car and I said I did not want to get out

21  of the car.  He was already scaring me the way he

22  was talking to me.  He says get the fuck out of the

23  car, and then finally he went around, opened up the

24  driver's door the passenger door and drug me out.

25  Q.    And as it relates to the safety plan that you

1  had with Shandel, you have no idea if she did that

2  or not, right?

3  A.   Yes, she has.

4  Q.   But you weren't present, you don't know what she

5  did.

6  A.   I'm just going by what she said.

7  Q.   Okay.  And as far as these telephone calls,

8  Mr. Pollock gave you his phone that night, was it

9  three different times to call?

10 A.   I couldn't even tell you on that at all.  I

11 don't even remember.

12 Q.   Do you remember telling Deputy Davidson that you

13 hadn't -- in addition to Deputy Cheesman -- do you

14 recall telling Deputy Davidson that you hadn't had

15 any contact with Mr. Pollock between the 10th and

16 the 16th?

17 A.   We had no physical contact, just conversation I

18 believe like during the week.

19         THE DEFENDANT:  Tony --

20         MR. VAUPEL:  Can I have just one moment with

21 my client?

22         THE COURT:  You may.

23 BY MR. VAUPEL:

24 Q.   Finally, ma'am, as it relates to these guns, you

25 never saw any guns on the 16th, right?

1  A.   16th, no.

2  Q.   Never saw any guns on the 17th?

3  A.   17th, no.

4  Q.   Charles didn't have a gun in his car?

5  A.   No.

6  Q.   You didn't see one, right?

7  A.   I didn't see one, no.

8  Q.   You didn't see any guns at the house, right?

9  A.   The only time that I saw guns was when he got

10 out of his mom's house back in June.

11 Q.   So sometime in June you saw gun cases?

12 A.   Right, I had to carry.

13 Q.   You didn't see guns on that day either; you

14 assumed they were guns?

15 A.   He told me they had guns.  He had low guns and

16 he had some big guns.

17 Q.   Again, you didn't see any guns.  You assumed

18 that they were guns, right?

19 A.   Oh, I carried the cases.  I know that they are

20 guns.

21 Q.   So you can tell what a gun is by the weight of a

22 box?

23 A.   The way the case is, it is shaped just like a

24 gun.

25 Q.   You didn't see any ammunition?

1  A.   No.

2  Q.   You didn't -- and then Charles didn't supposedly

3  say anything about going to the garage and the

4  suicide thing until after the fact, right?

5  A.   The kidnapping night, yes.

6         MR. VAUPEL:  No other questions.

7         THE DEFENDANT:  Wait.  One more.

8         THE COURT:  Mr. Chambers?

9         MR. CHAMBERS:  Are you done?

10                REDIRECT EXAMINATION

11  BY MR. CHAMBERS:

12  Q.   Kim, did Mr. Pollock kidnap you?

13  A.   Yes.

14  Q.   Did he rape you?

15  A.   Yes.

16  Q.   Did he threaten you with a gun during the

17  kidnapping?

18  A.   Yes.

19  Q.   And after he raped you?

20  A.   Yes.

21  Q.   To keep you from going to the authorities?

22  A.   Yes.

23  Q.   Why did you not get the two year restraining

24  order?

25  A.   Because he knew about it.  He asked and I could

1  not lie because I was afraid to get hit in the face.

2  So the two times that I was trying to get the two

3  year restraining order, he would lock me in his

4  house and I couldn't go anywhere until that court

5  date was done, and once I didn't show up then

6  everything gets dropped, canceled, or however you

7  want to put it.

8  Q.   When was the Florida trip in relation to the

9  kidnapping and rape?

10  A.   When was that?  That was before.  The Florida

11  was before the truck and all that.

12  Q.   And counsel asked you numerous questions about

13  your trial testimony in the state court about the

14  telephone calls.

15  A.   Uh-huh.

16  Q.   In fact on several occasions, on direct and

17  cross, in the state court you told the jury that in

18  fact you had had telephone contact with the

19  defendant that week, right?

20  A.   Yes.

21  Q.   You told him repeatedly that you talked to him

22  on the telephone?

23  A.   Yes.

24        MR. CHAMBERS:  Those are my questions.

25        Thank you, Your Honor.

```
 1           THE COURT:  Mr. Vaupel.
 2                     RECROSS-EXAMINATION
 3   BY MR. VAUPEL:
 4   Q.   Ma'am, did you just say that Mr. Pollock
 5   threatened you with a gun?
 6   A.   With a .45, yes.  He says that I will take -- we
 7   should go in the garage with the .45 and put our
 8   heads together and blast our brains.
 9   Q.   And -- and that was at his house then?
10   A.   Yes.
11   Q.   And that was after this?
12   A.   That was after he took me, raped me.
13   Q.   Well, and before he was found not guilty of
14   raping you, right?
15   A.   What?  I didn't hear you.  I didn't hear you.
16   Q.   He was acquitted of that, right?
17   A.   Meaning that he didn't -- yes.
18   Q.   And do you remember talking with Mr. DeWolf
19   about these threats?
20   A.   Yes.
21   Q.   And do you remember --
22           MR. CHAMBERS:  Your Honor, may we have a
23   page reference?
24           MR. VAUPEL:  172 and 173.
25   BY MR. VAUPEL:
```

1  Q.   Do you remember being asked, "He never actually
2  threatened to harm you, did he?"  And you answering
3  "no"?
4  A.   No, I don't recall that; I know he did.  He
5  threatened me, my family.
6  Q.   And then after your -- do you remember saying
7  that he just told you to shut your mouth, right?
8  A.   He said that several times.
9  Q.   And that he had never -- do you remember
10 testifying that he hadn't threatened you until being
11 upstairs?
12 A.   He threatened me when we were upstairs that was
13 the first time that he has threatened me about our
14 lives.
15 Q.   But that wasn't with -- he didn't threaten you
16 with guns or weapons or anything else, right?
17 A.   That was the only time that he threatened me
18 with a gun.
19 Q.   And by threatening he wanted to commit suicide.
20 A.   Uh-huh.
21 Q.   And here again, you hadn't seen a gun?
22 A.   No.
23 Q.   And how often had you been at his house?
24 A.   If I wasn't at his house he was at my house.
25 Q.   You had full access to his house?

A.   At one time I did have a key.  At one time he did have my key.

Q.   You never saw a gun there?

A.   No, just when we had to take it out of his mom's house.

MR. VAUPEL:  No other questions.

MR. CHAMBERS:  Your Honor, one very brief follow-up if I may.

THE COURT:  Go ahead.

FURTHER REDIRECT EXAMINATION

BY MR. CHAMBERS:

Q.   I want to ask you about the exchange with the defense attorney in state court, Mr. DeWolf. Mr. DeWolf says to you, "That evening all Bill used was his voice."

You say, "His voice, and he kicked me in the side of the head later that night?

And he said, "He had no weapons?"

You said, "Not in the house."

He says, "Not, not in his car?"

You said, "Not in the car, no."

And then he says, "Did he ever threaten you with a weapon?  And your testimony was, "He said at the end of the night why don't we go in the garage and we will put our heads together and blow our

1 brains out with a .45"?

2 A.   Yes.

3        MR. VAUPEL:  What page?

4        MR. CHAMBERS:  Page 154.

5        Thank you, Your Honor.

6        MR. VAUPEL:  Judge, I only have one

7 follow-up question to that.

8            FURTHER RECROSS-EXAMINATION

9 BY MR. VAUPEL:

10 Q.   Ma'am, in your initial written statement, isn't

11 it true that you reported that Mr. Pollock said that

12 he loves you and he wants to kill himself.

13 A.   No.  That he -- he had said that he's loved me

14 over and over and over and that he wanted to kill

15 both of us.

16        THE DEFENDANT:  She is lying.  The 17th.

17        MR. VAUPEL:  Judge, may I approach?

18        THE COURT:  You may.

19 BY MR. VAUPEL:

20 Q.   For purposes of identification, I will mark this

21 as Defendant's Exhibit A.  And do you want to

22 identify what Exhibit A is.

23 A.   Do you want me to say this is me or what is your

24 question?

25 Q.   Is that a handwritten statement?

A.   Yes, it is.

Q.   And that handwritten statement, does he indicate that he wanted to kill himself?

          THE COURT:  Whose statement is this?

          THE WITNESS:  This one is written by me.

          THE DEFENDANT:  She is lying.

BY THE WITNESS:

A.   "And for me not to move for he will kill me after the shower.  He took the bedroom, laid down, told me he would not take me home after he sobers up, and finally when took me home he says that I will probably never see you again and tells me that he loves me and that he wants to kill himself."  Yes.  Okay.  I do remember that and I did not think that I was going to come home alive, yeah.

Q.   So your first statement to law enforcement is that he wanted to kill himself?

A.   Yes, because he was talking about suicide --

          MR. VAUPEL:  No other questions.

          MR. CHAMBERS:  Your Honor, may I follow-up on that then?

          THE COURT:  You may.

               FURTHER REDIRECT EXAMINATION

BY MR. CHAMBERS:

Q.   Okay.  Let's look at -- what's defendant exhibit

1 was that?

2          MR. VAUPEL:  A.

3 BY MR. CHAMBERS:

4 Q.   Defendant Exhibit A, do you have it with you?

5 Do you still have a copy?

6 A.   No.

7          MR. CHAMBERS:  Have you put a copy in

8 evidence?

9          MR. VAUPEL:  Not yet.

10          MR. CHAMBERS:  Your Honor, I will move to

11 admit S-5 into evidence.  It is a copy of the entire

12 statement not an excerpt.

13          THE COURT:  Any objection?  Any objection?

14          MR. VAUPEL:  No.

15          THE COURT:  It will be admitted.

16 BY MR. CHAMBERS:

17 Q.   Beginning down at the bottom, you told Officer

18 Davidson on July 17 "He wanted to take a shower and

19 for me not to move or he would kill me."

20 A.   Uh-huh.

21 Q.   "After the shower he took to the bedroom, laid

22 down.  He told me he will take me home after he

23 sobers up and finally took me home.  He says that I

24 will probably never sees you again and tells me he

25 loves -- and that he wants to kill himself.  I did

1  not think I was going to come home alive."

2          That's what you told the officer, right?

3  A.   Yes.

4  Q.   And the very next day, the Chief of Police, John

5  Kellogg, interviewed you, correct, about the gun?

6  A.   Yes.

7          MR. CHAMBERS:  Your Honor, I move to admit

8  Government's Exhibit S-6?

9          THE COURT:  Any objection?

10         MR. VAUPEL:  Is that a different statement?

11         No.  I said no, I'm sorry.

12         MR. CHAMBERS:  Your Honor, I believe there

13  is no objection.

14         THE COURT:  It will be admitted.

15         Mr. Farmer, will you step up please.

16  BY MR. CHAMBERS:

17  Q.   Didn't you tell Chief John Kellogg that towards

18  the end of the night he started talking about

19  suicide --

20  A.   Yes.

21  Q.   And asked what I thought about going in the

22  garage, take our .45 gun, put our heads together,

23  pull the trigger and end our life?

24  A.   Yes.

25         MR. CHAMBERS:  No further questions, Your

1 Honor.

2          THE COURT:  Mr. Vaupel, anything?

3          MR. VAUPEL:  Judge, no other questions then.

4          THE COURT:  Okay.  Miss Bowyer, you may step

5 down.

6          Any further witnesses?

7          MR. CHAMBERS:  Not on this issue, Your

8 Honor.

9          I will then pass to Mr. Murphy on the

10 collection issue.

11          THE COURT:  Okay.  And if Miss Bowyer is

12 done as a witness, she can stay in the courtroom if

13 she wishes.

14          MR. MURPHY:  Judge, if I might, I call to

15 the Court's attention, first, to one of the

16 application notes for this particular subsection,

17 application note six on the most recent book, that's

18 on page 247.  It talks particularly there about the

19 factors that the Court can use with regard to this

20 lawful sporting purpose or collection issue, but I

21 want to draw the Court's attention to the very last

22 sentence down there where it says where the base

23 offense level is determined under subsection (a)(1)

24 through (a)(5), and then subsection (b)(2) meaning

25 this lawful sporting purpose or collection is not

applicable.  I therefore think that it is probably

necessary for the Court to make a determination

under which subsection the Court is going to set the

offense level because the government has an argument

that we want to make that if the Court determines

that the cross-reference is applicable here, then

you will have to make a determination with regard to

the lawful sporting purposes or collection.  But if

the Court does not set the offense level pursuant to

the cross-reference, then we have to determine what

other subsection it will be set under.  And if the

Court chooses to set it under (a)(1) through (a)(5),

then the Court doesn't even have to hear testimony

with regard to the issue at all.

        I'm suggesting to the Court that if the

Court can at this point make a determination as to

which subsection the Court will be using to set the

base offense level, we can perhaps even obviate the

testimony of one of our witnesses.

        THE COURT:  So you are asking that maybe I

should make a finding on the cross-reference first?

        MR. MURPHY:  Yes.  I believe that your

determination as to whether or not you will or will

not apply the cross-reference should be the first

determination.  And then secondly, if you are not

1 going to apply the cross-reference then we should

2 hear testimony so --

3        THE COURT:  Let's address then the issue of

4 the cross-reference first.  I think maybe clearing

5 that up is a good idea.

6        Let's have argument on that.

7        MR. VAUPEL:  Judge, Mr. Pollock wants to

8 testify as it relates to the cross-reference.

9        THE COURT:  That's fine.  Now would be the

10 time to do it then.

11        Do you want to call him to the witness

12 stand?

13        MR. VAUPEL:  I will ask him to testify.

14        THE COURT:  Okay.  Do you want to come

15 forward please and raise your right hand.

16        (The defendant was sworn.)

17        THE DEFENDANT:  I do.  I would just like to

18 say that some of my notes are based on memory, not

19 actual transcripts, because I have not received the

20 transcripts, so there might be a slight bit of error

21 but they are to the best of my memory and my ability

22 that I have.

23        THE COURT:  Okay.  Be seated.

24              CHARLES POLLOCK,

25 after having been duly sworn, testified as follows:

```
 1            DIRECT EXAMINATION
 2  BY MR. VAUPEL:
 3  Q.   Mr. Pollock, can you state and spell your last
 4  name?
 5  A.   P-o-l-l-o-c-k.
 6  Q.   Charles, I'm going to question you first on this
 7  issue of the cross-reference then you understand
 8  that you will still have the right to a statement of
 9  allocution after the fact, right?
10  A.   Yes.  It might save time if I can just read the
11  statement that I prepared then we can go from there.
12          MR. CHAMBERS:  Your Honor, would you like
13  Miss Bowyer to step out during this part in case she
14  is called in rebuttal?
15          THE COURT:  If you think that she might be
16  called in rebuttal then she probably should.
17          And if you are going to have questions asked
18  and answers given, we will do it this way.  If he is
19  just going to give his statement as it pertains to
20  the cross-reference, then I imagine he would not be
21  subject to cross-examination but there is not going
22  to be a statement read from the witness stand.
23          So I will allow him to speak as to the
24  cross-reference by way of statement if he wishes to
25  do so, but if he is going to be subject to questions
```

 1  and answers, he will be subject to

 2  cross-examination.

 3  BY MR. VAUPEL:

 4  Q.   Do you understand that, Charles?

 5  A.   That's fine with me.

 6        THE COURT:  All right.

 7  BY MR. VAUPEL:

 8  Q.   What is it you wanted to tell the Court.

 9        THE COURT:  Is this going to be a statement

10  then?  Is this how we are doing this or are we going

11  to do it by question and answer?

12        THE DEFENDANT:  We can stop at any point you

13  like --

14        THE COURT:  No, I'm not starting and

15  stopping anybody.  You have two choices: question

16  and answer and statement in allocution or just the

17  statement.

18        MR. VAUPEL:  I think Mr. Pollock just

19  prefers to give his statement.

20        THE COURT:  Then he can do it from the

21  defense table.

22        THE DEFENDANT:  I have no objection to being

23  questioned, Your Honor.

24        THE COURT:  It is up -- between you and your

25  attorney.

1       MR. VAUPEL:  Charles, do you understand what
2  the issue is?  Do you want me to ask you questions
3  or to give the statement?
4       THE DEFENDANT:  Yeah.  I will do both.  I
5  will give my statement and you both can question me.
6  Isn't that the way the judge explained it?  I have a
7  choice?
8       MR. VAUPEL:  No.  I have to ask you
9  questions then Mr. Chambers will have the
10 opportunity to cross-examination.
11      THE DEFENDANT:  That's fine.  I will then be
12 able to read my statement at the end, correct?
13      THE COURT:  Correct.
14      MR. VAUPEL:  Correct.
15      THE DEFENDANT:  Thank you, Your Honor.
16 BY MR. VAUPEL:
17 Q.   Charles, have you ever hit Miss Bowyer?
18 A.   No.
19 Q.   Have you ever choked Miss Bowyer?
20 A.   Never.
21 Q.   Have you ever threatened to kill her?
22 A.   Never.
23 Q.   At one point in time or at any point in time, I
24 should say, have you ever broken up with her?
25 A.   Yes.

Q.   Have you tried to get away from her?

A.   Yes, I have numerous times.

Q.   Was one of those times when you left to go to Florida?

A.   Yes, it was.

Q.   Can you tell me what happened?

A.   Basically, she was cheating on me in a relationship.  I caught her in the front seat of a car screwing a guy in the bar parking lot.  So I told her it's done; we are over.  At that point I made arrangements to go and stay with my mother in Florida.  She called me, asked me where I was at.  I says I'm sitting at home.  She says, you're lying; I'm in your driveway you are not here.

         At this time she has a key to my house.  I said I am in Peoria Airport going to fly to Florida. I flew to Florida.  Within 24 hours she pulls in my mother's driveway.  I told my mother I'm going to tell her to get down the road.  My mother advised me against it.  My mother said, she's made a mistake, she really loves you, you might want to think this over.  It was Christmas season, she was with her daughter, so her and her daughter stayed in the spare room at my mother's.

Q.   Is this December 2010?

A.    I believe so, yes.

Q.    Have you ever broke up with her any other times?

A.    Yes, I have.  I've left her numerous occasions.
The one example is when she comes to Lafayette
there.  She knows that I go there, have catfish
there.  She called me.  I said, I was there eating
dinner.  She drove over there.  And she is trying to
be rather friendly or persuasive, so I go along with
it, and she is saying that she has called the cops
on me.  She is saying that I stole her truck.  I
vandalized her truck.  And she showed me her truck.
There was a couple little dents in it, the mirror is
broke.  I didn't see nothing too seriously wrong
with it.  So at that point we are going to leave and
go to my friend's house.  She gets on my bike with
me.  About halfway there, I'm thinking, you know,
she is cheating on me, she is saying that I stole
and vandalized her truck.  She's lying to me.  I
turned around and took her back to her truck and I
says, you know, it's over Kim.  At that point she
got back in her truck.  She is crying.  So she
starts calling me again.  I have phone records to
verify these phone calls that were entered into
evidence in Knox County.

Q.    Was this in July of 2010?

1  A.   It would have been approximately July.

2  Q.   Now --

3  A.   July 9th I believe.

4  Q.   And was there a time in Wataga when --

5  A.   Yeah.

6  Q.   -- she left?

7  A.   Yeah.

8  Q.   Now why did she leave?

9  A.   I have no idea why she left.

10 Q.   And was that right around July 10th?

11 A.   That had to be the weekend of July 16th, 17th, I

12 believe.

13 Q.   And if I didn't say this before, sir, it would

14 be July of 2011; is the year?

15 A.   Correct.

16 Q.   And so you are at a drinking establishment or

17 bar in Wataga and she leaves?

18 A.   Actually we were in the Jimmy's Pizza and she

19 went next door to play pool.  She drinks pretty

20 heavy, becomes intoxicated and she left.  The trial

21 transcripts in Knox County clearly show that she

22 became violent and abusive, and she left on her own

23 free accord --

24 Q.   I'm not worried about the trial transcripts.

25 Tell me what happened there.  How did she become

1  violent?

2  A.   She thought that I was flirting with some girl

3  there.

4  Q.   What happened?

5  A.   She took her beer bottle and threw it at my

6  head.  It bounced off my shoulders and broke on the

7  wall next to me.  And then she stormed out the door.

8  That was approximately at 9:30 at night.

9  Q.   Did you see her again that night?

10  A.   No, I did not.

11  Q.   Did -- after she left the bar, did she start

12  calling you or texting you or anything like that?

13  A.   At that time she didn't call me.  She

14  disappeared at about 9:30.  Waited for another

15  approximately couple hours.  She never come back, so

16  I left.

17  Q.   Now --

18  A.   She called me at -- I got the phone records.  I

19  am going to say at 3:30 in the morning is when she

20  called me.  The funny thing is the police officer

21  picked her up at 3:06 in the morning.  She called

22  and reported her truck stolen at 3:02 in the morning

23  before she's ever been at my house.  She also says

24  that I have her purse and her keys and her cellphone

25  in my saddle bag and then she testified that I

1  didn't have them.  What struck me as odd that she

2  reported her truck stolen before she ever went to my

3  house.  And this is documented factual evidence from

4  the transcripts and her testimony.

5  Q.   Did you take her truck?

6  A.   No, I didn't take her truck.

7  Q.   Did you have her purse and phone and all of that

8  stuff?

9  A.   She left some clothes in the saddle bag of my

10  motorcycle is the extent that -- I believe it was a

11  leather coat and some shorts or something of that

12  nature.

13  Q.   Did -- now moving forward to -- well, actually

14  let's wrap up a couple of loose ends going backwards

15  in time.  Did you ever pull her off a bar stool by

16  her hair?

17  A.   No.

18  Q.   Did you ever ram her face into the ground?

19  A.   Definitely not.

20  Q.   Did you ever threaten her daughter or other

21  family members?

22  A.   No.  And in the court transcripts, again, her

23  daughter even testified that I never threatened her.

24  They had domestic battery put on me for allegedly

25  pushing her daughter.  Her daughter took the stand

1 and testified that I never laid a hand on her or her
2 mother.
3 Q.   All right.  So now moving back to this night of
4 this alleged sexual assault.  Why did you go to her
5 house if you did?
6 A.   She kept calling me.  Going to Arkansas and they
7 wanted me to come get her dog and watch the dog.  I
8 really said I really don't want no part of it and
9 she said that Shandel, which is her daughter, you
10 know, would really like to see you before she leaves
11 and we need you to watch the dog.  When I went to
12 their house, her daughter was on the porch, and I
13 was like where is the dog, and her mom was pretty
14 irate I guess, and I says, you know, I'm not here to
15 argue with you.  So she went and got in my car in
16 the passenger seat and I told her to get out.  She
17 would not exit my car.  So at that point I says, I'm
18 going home, get out of my car.  She says, you're not
19 getting rid of me that easy.  I drove her home with
20 her in my car.  She left her cell phone and her
21 purse on the porch at that time.  She asked to use
22 my phone and she called her daughter numerous times
23 throughout the night.
24 Q.   Now did you ever pick her up and throw her in
25 your car?

```
 1  A.   No, not at all.
 2  Q.   Did you ever yell at her or punch your car?
 3  A.   No.
 4  Q.   Did you drag her out of your car?
 5  A.   No.  And the funny thing is the police report
 6  says that her daughter saw me grab her mother by the
 7  neck and hair and carry her to the car and force her
 8  in the car.  Her daughter under oath testified, "My
 9  mother told me to say that; I never seen it."  I can
10  document that in court records right now.  Her
11  daughter says, "My mom told me this.  My mom told me
12  to testify."
13          In fact, when she is on the stand in Knox
14  County, the girl, Shandel, started to cry.  They
15  took a recess.  She goes back into the witness room.
16  They bring her back out.  My attorney questions her
17  again.  She starts to cry.  They take her back in
18  the witness room.  My attorney says, "Bill, what's
19  going on?  Why is she crying?"  I said, "I don't
20  know why she is crying."  They bring her back out
21  again.  My attorney says, "I have got her.  I don't
22  know what's going on here."  She sets down in the
23  witness stand.  My attorney says they are telling
24  you what to say back there, aren't they, referring
25  to the state's attorney and her mother.  And Shandel
```

1  Henderson says, yes, they are telling me what to say
2  back there.  She says, my mom told me what to say.
3  Clearly, her mother was telling her what to say and
4  she testified under oath in Knox County that her
5  mother told her to lie on the stand in the presence
6  of the state's attorney.  This is all documented in
7  Court transcripts.  This is fact in the court
8  transcripts that we have in this courtroom today to
9  document that Kim Bowyer was telling her daughter
10  what to say under oath in the presence of the
11  state's attorney.  This fact alone makes her
12  testimony not credible.
13  Q.   On this day when Miss Bowyer came over to your
14  house, did the police show up?
15  A.   The day she refused to get you out of my car,
16  yes, she did.  At that time she testified here that
17  I'm holding her in a fetal position.  She can't even
18  breathe.  She says I shut the windows when I got in
19  my house and shut the lights off and shut the
20  blinds.  The police --
21  Q.   I'm not worried about her testimony.  Did you
22  physically restrain her in any way?
23  A.   No.  The police officer right in the trial
24  transcript says that he looked in the window and
25  seen her sitting on my lap.  She wasn't hurt.  She

1  wasn't crying.  She wasn't restrained.

2  Q.   Were your windows open or shut?

3  A.   I have no air conditioning.  My windows are open

4  all summer.

5  Q.   And how close was your chair to the opened

6  windows?

7  A.   The officer testified he was within 18 inches of

8  me and her and had a perfectly clear view.  It is

9  dark outside.  My lights are on so he is looking

10  from the dark inside.  Both officers testified they

11  seen her.

12  Q.   I'm not worried what the officers are saying.

13  I'm asking you how close was your chair to the

14  window with the police officer?

15  A.   The police officer is right here in my face.

16  She is sitting on my lap so she is looking -- I

17  believe he testified 18 inches.  He is within 18

18  inches of us.

19  Q.   And you gestured with your hands so that, that

20  would be fair that you were within 18 inches or so?

21  A.   Yes, my recollection could be even less than 18

22  inches.

23  Q.   Did you tell Miss Bowyer to shut up or not make

24  any noise?

25  A.   No, I did not.

1  Q.   Why didn't you -- why didn't you answer the
2  door?
3  A.   I just didn't want to answer the door.
4  Q.   Why not?
5  A.   You know, one right that I have left in this
6  country and that is not to answer my door.  My front
7  door was open as the already officer testified.  My
8  door was not -- he could have opened the screen door
9  and walked in my house.  When we got back to my
10  house, I left her in the car, a few minutes later
11  she come in my house.
12  Q.   All right.  Then finally here, when you went
13  upstairs -- well, did you go upstairs?
14  A.   Yes, I did go upstairs.  I went upstairs and
15  took a shower.  I told her we are here for you.
16  When the cop was at my window I stood up, she got up
17  and sat in the other chair.  I said they are here
18  for you, your daughter probably called them, you
19  deal with them.  I went upstairs to take a shower.
20  Q.   Did you threaten her at that point?
21  A.   No, I do not.
22  Q.   Did you ever threaten Shandel or her mother or
23  any of her other children?
24  A.   No.  It is in the trial transcript, Shandel
25  says, I've never touched her or threatened her.

1 This is testimony she stated under oath in Knox

2 County.

3 Q.  Did you force sex upon Miss Bowyer against her

4 will?

5 A.  I never had sex with her.  The cops are at my

6 house.  She's followed me home.  She has accused me

7 of damaging her truck.  She's cheated on me.  This

8 does not sexually arouse me.  I didn't want her at

9 my house.  I gave her my phone to call her daughter

10 to pick her up.

11 Q.  Did you -- and finally, did you -- did you --

12 that that's my last question.

13          MR. CHAMBERS:  Your Honor, very briefly.

14                  CROSS-EXAMINATION

15 BY MR. CHAMBERS:

16 Q.  So Mr. Pollock, let me see if I understand

17 correctly, you didn't want Kim Bowyer at your house

18 that night, right?

19 A.  Correct.

20 Q.  She was there against your will, right?

21 A.  She got in my car and would not get out.

22 Q.  And then she went in your house, right?

23 A.  She walked in my house of her own free accord.

24 Q.  And sat on your lap, right?

25 A.  Not in the beginning.  Let's clarify the facts

1  here.

2  Q.   Why don't you answer my questions and then you

3  can answer your counsel's questions when he asks

4  you.  Did she sit on your lap?  Yes or no.

5  A.   Two hours after she was at my house she finally

6  come when the cops got there and sat on my lap.  Two

7  hours later.  She had been at my house for two

8  hours.

9  Q.   Why didn't you say to the policeman,

10  Mr. Policeman --

11  A.   I should have.

12  Q.   -- why don't you come and get her.  I don't want

13  her in my house.

14  A.   You don't how many times I wish I have said

15  that.

16  Q.   Also -- let me ask you another question.  She's

17  not the first woman you have beat, is she?

18        MR. VAUPEL:  Objection.

19  BY THE WITNESS:

20  A.   Obviously, you might want to check the court

21  records because I have no history of any kind of

22  abuse to any woman.

23  BY MR. CHAMBERS:

24  Q.   What about Robin Linder?

25  A.   What about her?  I lived with her from 19 -- I

1   lived with her from '86 to 2008.

2   Q.   Mr. Pollock, were you convicted of unlawful

3   violation of order to protection, two counts,

4   against Miss Linder?

5   A.   Yes, I was.

6   Q.   Were you convicted of aggravated -- a felony,

7   aggravated stalking against Miss Linder?

8   A.   Yes, I was.

9   Q.   And finally, is it your testimony under oath,

10  Mr. Pollock, that at no time during the trial

11  testimony did Miss Bowyer's daughter say that you

12  threatened her?

13  A.   In Knox County, did Kim Bowyer's daughter ever

14  say I threatened her?

15  Q.   Under oath at the state trial.

16  A.   Let me check my records.  I'm pretty sure --

17       MR. CHAMBERS:  Your Honor, those are my

18  questions.

19       THE DEFENDANT:  I would like to answer that

20  question.

21  BY MR. CHAMBERS:

22  Q.   Well, go ahead.

23  A.   Kim Bowyer's daughter said that her mother says

24  that I threatened her.  Shandel Henderson never says

25  I threatened her.  She says my mother told, me he

1 threatened me, and that's in the court transcripts.
2 Read a couple more paragraphs and you will see that.
3 Q.  Question:  You said a few minutes ago he
4 threatened -- this is to the witness, the daughter
5 -- he threatened to kill you before.  And is she
6 says, he broke down the door, jammed our kitchen
7 door, busted my mom's bedside post, got some holes
8 in our walls for the door knobs and I came in and he
9 was just mad.
10 A.  Read the next sentence because she says that I
11 actually walked in the house.  You got a couple more
12 paragraphs down there.  She says that I didn't break
13 in the door, I walked in the house.
14 Q.  I will go to the next paragraph.  Shandel, on
15 that occasion did he threaten to kill you?
16      Answer:  I know it was my mom and me.  I
17 know there was another occasion where he threatened
18 my grandma and my sister, my mom and me too.  Isn't
19 that what she said?
20 A.  Read a couple more.  She says, my mom told me to
21 say that.  You are reading half of the truth here.
22      MR. CHAMBERS:  Those are my questions.
23      THE COURT:  Mr. Vaupel, anything else.
24      MR. VAUPEL:  No, not on redirect.
25      THE COURT:  You may step down.

1           THE DEFENDANT:  I don't get to read my

2   statement?

3           THE COURT:  You can.

4           THE DEFENDANT:  Thank you, Your Honor.

5           THE COURT:  Okay.  What do you believe is

6   the standard for making any finding as to

7   cross-reference?

8           MR. CHAMBERS:  Preponderance of the

9   evidence, Your Honor.

10          THE COURT:  And under what section is that?

11  Does 2X1 apply here at all under other offenses?

12  That's attempt solicitation or conspiracy, 2X1.1.

13  It is just referencing the -- where did I see it?

14          Mr. Farmer, is that referenced in the

15  Presentence Report?  Let me ask this, did both of

16  the parties agree that it is preponderance of the

17  evidence.

18          MR. CHAMBERS:  The government does, Your

19  Honor.

20          MR. VAUPEL:  Yes, Judge.

21          THE COURT:  Okay.  Then never mind with my

22  question.

23          All right.  Then I think that we should

24  proceed with the issue of collection because I don't

25  think that -- we don't need to argue first the other

1  -- I'm going to make alternative -- I'm going to

2  have alternative discussion.

3          MR. MURPHY:  We need to have Matt.

4          THE COURT:  Okay.  And you can ask

5  Miss Bowyer to come back in if she wishes.

6          Sir, do you want to come forward please and

7  raise your right hand.

8          (Witness sworn.)

9          THE COURT:  Go ahead, Mr. Murphy.

10          MR. MURPHY:  Thank you, Judge.

11                  MATTHEW GALECKI,

12  after having been duly sworn, testified as follows:

13                  DIRECT EXAMINATION.

14  BY MR. MURPHY:

15  Q.  Sir, would you please state your name.

16  A.  Matthew Galecki.

17  Q.  I believe that you were a witness at the trial

18  in this case, were you not, Matt?

19  A.  I was.

20  Q.  And you're a special agent with ATF, correct?

21  A.  Correct.

22  Q.  I want to ask you a few questions today with

23  regard to the weapons involved in this case.  Are

24  you familiar with those weapons that have been

25  seized?

1  A.   Yes, I am.

2  Q.   And I believe there was also some ammunition

3  that was seized as well?

4  A.   I believe that's correct.

5  Q.   We are now presenting evidence with regard to

6  the issue raised by counsel as to whether or not the

7  weapons were possessed for either lawful sporting

8  purposes or for collection.  And I believe we are

9  primarily emphasizing the collection; is that right,

10  counsel?

11        Let me ask, first of all, were there any of

12  these weapons that were in either poor or old,

13  ancient condition?

14  A.   Some -- I would consider some of the weapons in

15  average to below average condition.

16  Q.   What do you mean by that please?

17  A.   Primarily lack of maintenance.  A lot of it

18  being care, oiled, cleaned, so to speak.

19  Q.   You are aware, are you not, as to where the

20  weapons had been stored while they were at or about

21  the defendant's property?

22  A.   Yes.

23  Q.   And where was that?

24  A.   I believe that was in the back part of the truck

25  of the vehicle.

1  Q.   You're aware that there were both long guns and

2  handguns, correct?

3  A.   Correct.

4  Q.   Are you aware as to the .45 caliber handgun?

5  A.   I am.

6  Q.   And what did you notice in particular about that

7  .45 caliber handgun?

8  A.   The frame of the firearm, complete firearm was

9  made by Essex Arms; however, the slide of the

10 firearm was made actually by a different company.

11 Q.   As well, are you familiar with legitimate

12 collectors of firearms?

13 A.   I have come in contact, yes.

14 Q.   In terms of the collection of firearms, how is

15 the present of ammunition or the use of the

16 ammunition in the firearms considered with regard to

17 those who legitimately collect firearms?

18 A.   The experience that I have had with collectors

19 generally they don't fire cartridges through the

20 firearm.  They like to keep them in the original

21 condition or the condition -- the best condition

22 they could possible to preserve the integrity and --

23 Q.   So the presence of ammunition is one factor that

24 you would consider as to whether or not these guns

25 are being collected or not?

1  A.    Yeah, I would say so.

2  Q.    Are you also aware that consistent with the

3  verdict of the jury in this case, that the defendant

4  was restricted by the law of the State of Illinois

5  from possessing firearms?

6  A.    Yes.

7  Q.    And that was because why?

8  A.    Previous conviction I believe.

9  Q.    Okay.  And were you aware that that was a prior

10  conviction from, I believe, Henry County for

11  aggravated stalking?

12  A.    Correct.

13  Q.    Now, are you aware that consistent with the

14  facts of this case that the defendant while

15  incarcerated in Knox County in July of 2011 made

16  efforts to have another individual take these

17  firearms from where they had been stored in the

18  trunk of his vehicle and to secret them?

19  A.    Yes, I was made aware of that situation.

20  Q.    And were you further aware that there was

21  testimony given here by that other individual, that

22  friend of the defendant?

23  A.    Yes.

24  Q.    Again, in your experience, is that typical that

25  a legitimate collector simply gives his weapons to

1  another individual to secret them?

2  A.   No.

3  Q.   Isn't the purpose of a legitimate collection in

4  fact to display them to show them to others?

5  A.   I would agree with that and for, as well as for

6  my monetary purposes or gain if the collector or

7  individual would like to sell those firearms.

8  Q.   And you have been an agent how long now?

9  A.   Since 2001.

10  Q.   And have you ever run into a situation where a

11  legitimate collector of firearms, in fact, stores

12  the weapons in the trunk of a car on somebody else's

13  property?

14  A.   No.

15       MR. MURPHY:  Thank you, Judge.  Those are my

16  questions.

17       THE COURT:  Mr. Vaupel.

18       MR. VAUPEL:  Sir, I just have a few

19  questions.

20              CROSS-EXAMINATION

21  BY MR. VAUPEL:

22  Q.   The majority of these weapons were fairly old,

23  correct?

24  A.   I would say that's an accurate statement.

25  Q.   Going from memory, I think a couple of them were

1 as old as 1910 or 1911 and through there they just

2 missed the Antiquity Act?

3 A.   Correct.

4 Q.   And this handgun, the Essex with the Colt slide,

5 on appearance it appeared to be a Colt handgun,

6 correct?

7 A.   From my perspective, no.

8 Q.   And why did it not appear to be a Colt?

9 A.   Because in my training and experience we are --

10 the firearm's identified by the markings that are on

11 the receiver not the slide.

12 Q.   Where is the receiver at?

13 A.   The bottom portion of the firearm.

14 Q.   So if I'm holding a gun and I turn it upside

15 down and I am looking at the bottom of the gun,

16 that's where the mark is?

17 A.   It would be -- the slide would be above the

18 trigger housing, so to speak, for the trigger.

19 Q.   And does the slide conceal the markings at all?

20 A.   It can possibly.

21 Q.   Did it in this case?

22 A.   I don't recall.

23 Q.   If -- as it relates to the presence of

24 ammunition, did -- do you know if these guns had

25 been previously fired?

1  A.    Prior to me field testing them?

2  Q.    Yes.

3  A.    I do not know.

4  Q.    Do you know gun collectors who do use their guns

5  to fire on a range or anywhere else?

6  A.    Personally speaking, I do not.

7         THE DEFENDANT:  Tony.

8  BY MR. VAUPEL:

9  Q.    And to be fair, you don't hang out with

10 collectors?  Your role is law enforcement and you

11 are constantly looking into firearm cases, fair?

12 A.    Correct.

13 Q.    And so, from the standpoint of your expertise,

14 you know right off the bat what kind of gun you are

15 looking at but it would be fair to say that you

16 don't know the habits of most collectors?

17 A.    The habits of most collectors.

18 Q.    Right.

19 A.    The few that I have encountered or spoken with,

20 I can honestly say that they either maintain their

21 firearms as brand new or in the best possible

22 condition.

23 Q.    And at trial when I asked you was -- did this

24 look like a collection to you, did you -- did you

25 say something to the affect of a collection is what

1 each individual makes of it?

2 A.   I'd have to see the transcript but there is no

3 definition that I'm aware of by federal law that

4 actually identifies what a collection is.

5 Q.   I guess what I'm getting at, maybe poorly, is

6 some people have really nice collections and people

7 have really crappy collections, right?

8 A.   Or -- just a group of firearms?

9 Q.   Right.  And just because they have collected

10 old, yet not very nice guns, doesn't make it any

11 less of a collection.  They are just not as nice as

12 other people's collections, fair?

13 A.   It all depends on the person I suppose.

14 Q.   So, in this particular case, you don't have any

15 personal knowledge as to whether Mr. Pollock was

16 collecting guns or why he would be doing it?

17 A.   Yes.

18        MR. VAUPEL:  No other questions.

19        MR. MURPHY:  Just one last question.

20               REDIRECT EXAMINATION

21 BY MR. MURPHY:

22 Q.   Special Agent Galecki, you would not expect a

23 legitimate collector of firearms to be telling

24 someone that he thought they ought to go to the

25 garage and blow their brain out with one of their

 1  guns, would you?

 2  A.   No, I would not anticipate that.

 3        MR. MURPHY:  That's all.  Thank you.

 4        THE COURT:  Mr. Vaupel, anything?

 5        MR. VAUPEL:  No.

 6        THE COURT:  Sir, you may step down.  Thank

 7  you.

 8        MR. MURPHY:  The final objection has to do

 9  with the enhancement for obstruction but I think

10  that the first thing to do is argue the

11  cross-referencing objection and the collection.

12        Is there anymore -- is there any evidence

13  from the defense?  Anything further?

14        MR. VAUPEL:  No.

15        THE COURT:  Anything further from the

16  government on these two issues?

17        MR. CHAMBERS:  No, Your Honor.

18        THE COURT:  Okay.  Go ahead, Mr. Chambers.

19        MR. CHAMBERS:  Your Honor, may it please the

20  court, counsel.

21        We believe that the United States Probation

22  Office has properly applied the cross-reference.

23  The guideline is to be applied where the defendant

24  used or possessed any firearm or ammunition in

25  connection with the commission or attempted

commission of another offense.  The phrase "in
connection with," Your Honor, we would submit to the
Court that here after kidnapping the victim he raped
her and then he threatened her with the gun in an
attempt to keep her from reporting the kidnapping
and the rape to the authorities.  After the sexual
act is completed, that he is expressing the
depression and remorse, he is threatening her with
the gun; take you downstairs put our heads together
and he blow our heads off with the .45.  In order to
threaten her so that she wouldn't go and report the
kidnapping and the rape.  We think that's clearly in
connection.  We think clearly the Presentence Report
writer is correct and that the cross-reference
should apply.

True, he was not convicted of the offense in
state court of the kidnapping of the rape, but the
defendant, as the Court is aware, does not have to
be convicted of the other offense in order for the
cross-reference to apply.  We submit to the Court
that it does.

Thank you.

THE COURT:  Mr. Vaupel.

MR. VAUPEL:  Yes, Judge.

Your Honor, while I agree that the standard

1  is by a preponderance of the evidence, it's not that
2  simple.  There are a number of different connections
3  that the government has to make in order to be able
4  to cross-reference a given case.  I have set all
5  that out in my motion, or my sentencing memorandum
6  rather, and so I won't repeat it all here, the
7  problem that seems most pressing right now is that
8  Miss Bowyer, again, testified here today as she has
9  -- this is one of the few consistent parts of her
10  testimony that she never saw a gun.  There was no
11  gun in the car.  No gun in the house.  No gun at
12  all.  Mr. Chambers attempts to bootstrap some sort
13  of a claim of suicide after the fact to a threat but
14  there is no reference of a gun until this supposed
15  sexual attack took place.
16         Therefore, the gun wasn't used in connection
17  with some sort of a sexual assault or abduction or
18  anything else?  It is referenced after the fact.
19  Miss Bowyer, when she took the stand, she didn't
20  say, hey, look I knew he had guns and I was afraid
21  if I didn't do what he said, he was going to get out
22  his gun and shoot me.  She didn't say, hey, I knew
23  that he had guns in the house and therefore I
24  complied or anything like that.  And that's -- there
25  has to be some sort of a nexus.  There has to be

1  some sort of commonality and I cited the Ritsema
2  case in the sentencing memorandum and the Court in
3  that case said that the "temporal dimension of
4  relevant conduct could not reasonably have been
5  intended to cause a Court to convert one single
6  possession conviction into a sweeping tool to gather
7  an all otherwise unrelated criminality of a
8  defendant which occurred contemporaneously with the
9  charged offense."  And that's what we have here.  I
10  mention that at the bottom of my page five of the
11  sentencing memorandum.
12      Mr. Chambers is arguing that we have a
13  possession and we have sex abuse.  Aside from the
14  fact that Mr. Pollock was found not guilty of these
15  various charges in Knox County, we have some claim
16  of sexual abuse; and therefore, it's all connected
17  but it is not.  There has to be a nexus.  There has
18  to be a commonality.
19      Likewise, Mr. Chambers hasn't even proven
20  that the gun was readily available.  Supposedly
21  these guns were in the trunk of some car on someone
22  else's property in an undetermined distance away,
23  whether it was a hundred yards or more or less.
24  There was a case that came out in -- I think it was
25  last week.

1      THE COURT:  Let's move back past the sexual

2  assault issue on this matter.  Do the parties agree

3  that it requires the finding of preponderance of the

4  evidence that a gun was used in connection with or

5  commission of an attempted commission of another

6  offense, that is the standard, right?

7      MR. CHAMBERS:  Correct.

8      THE COURT:  Okay.  So until we get to the

9  part about -- as I understand the testimony after

10  the sexual assault, and the part about going to the

11  garage, a gun is not mentioned.  Now, whether or not

12  Miss Bowyer was aware of -- had in her mind that he

13  had guns or that didn't come out in testimony; is

14  that right?

15      MR. CHAMBERS:  Correct.

16      THE COURT:  So the question in my mind then

17  is at the point where he brings up the gun was that

18  in commission of another offense?  Is that the

19  government's position?

20      MR. CHAMBERS:  Your Honor, it is the

21  Government's position.  The government's position is

22  the kidnapping is continuing.  The rape has just

23  occurred.  He is threatening her with this 45 which

24  she knows that he has and by threatening her, he's

25  attempting to prevent her from going to the

authorities.  So although the sex act is finished,
she still could report it.  He made the comment,
well, you have my DNA; you could really get me in a
lot of trouble.  So he is trying to convince her not
to go to the authorities.  He is threatening her
with the .35 and at that time the kidnapping is
still a continuing offense.

THE COURT:  So address that, Mr. Vaupel.
Let's go to that point.

MR. VAUPEL:  Judge, my recollection was that
she was asking for him to take her home and he said
something to the -- there was some sort of testimony
and that was something to the affect of after I
sober up.  There is no continuing abduction and
there is no attempt to conceal anything.

If we take Miss Bowyer's testimony at face
value, these are words spoken by somebody who is
depressed as opposed to attempting to conceal any
past crime.

THE COURT:  Okay.

MR. VAUPEL:  And then, Judge, I would just
direct your attention back to Exhibit A wherein
Miss Bowyer wrote, he told me he'd take me home
after he sobers up, and finally took me home; says
that I'd probably never see you again and tells me

1 that he loves me and wants to kill himself.  That's

2 her statement on July 17 which again is consistent

3 with after the fact.

4        THE COURT:  And you're saying in the context

5 was that statement made before or after the

6 reference to the .45 realizing that Mr. Pollock

7 denies even referencing the .45.

8        MR. VAUPEL:  This would occur when -- this

9 would be different than -- well, let me square

10 myself up here.

11        This statement -- Miss Bowyer doesn't allege

12 that he threatened to commit suicide with her.  This

13 statement is him saying, allegedly, that he would

14 kill himself.  There is a second statement I think

15 is Government's Exhibit B or C or something in which

16 they reference putting their heads together.

17        THE COURT:  Okay.

18        MR. CHAMBERS:  Your Honor, if I may, the

19 statement concerning the gun is much earlier before

20 they go home.  The statement about sobering up and

21 taking her home is the very end and even then,

22 threatening to kill her with a .45 is related to the

23 kidnapping and related to the sexual rape.  He was

24 concerned about what she could do now that she had a

25 case against him.  She testified here this afternoon

1 and he was trying to convince her not to go to the

2 authorities.

3          THE COURT:  Okay.  Mr. Vaupel, now move on

4 to why this was a collection and then I will let

5 have Mr. Murphy address it.

6          MR. VAUPEL:  Thank you, Judge.

7          Your Honor, as it relates to the collection

8 case, these firearms fall under two general

9 categories.  It is not a smattering of all different

10 firearms.  These were, as I recall, Colt and

11 Winchester with exception of one Essex, which an

12 expert can figure out that this was an Essex;

13 however, it had a Colt slide on it.  And I believe

14 that it looked like a Colt, and therefore, would --

15 it would pass itself off to most folks as a Colt

16 handgun.

17          Unspoken here is just because somebody

18 collects something doesn't mean that they are

19 sophisticated.  It doesn't mean that they have a

20 great collection or anything like that.  A person --

21 you can have two collectors who collect anything

22 whether it is football cards or guns and some of

23 these collectors will be very sophisticated and have

24 very nice and elaborate well-maintained collections

25 and some people don't.  And the government hasn't

1  proven anything as it relates to whether or not

2  there is an actual collection, but we do know that

3  these are fairly old weapons.

4          There is only two kinds, with the exception

5  of the Essex.  And although they weren't maintained

6  as well as some other collectors, we feel that it

7  meets the definition of this.

8          THE COURT:  Thank you.

9          Mr. Murphy.

10          MR. MURPHY:  I suppose, Your Honor, that

11  following that rationale argued by counsel, that

12  when I pull into Mr. Chambers' house up to his house

13  next time, I should draw the conclusion that he is a

14  collector of Ford automobiles because there are

15  three Fords in his driveway.  I don't think that

16  that argument holds water.  I think that we are

17  given circumstances for the Court to consider as to

18  whether or not it is a legitimate collection.  The

19  number and type of firearms, it certainly wasn't an

20  extensive collection of firearms.  The amount and

21  type of ammunition, I submit, is relevant because

22  there was ammunition for these firearms and the

23  legitimate collector doesn't usually use the

24  ammunition in the firearm.  They try to keep them in

25  as pristine collection as they can.

1          The location of the firearms; these were
2  located for a period, apparently, for 30 days, and I
3  think that that's important too.  Judge, he picked
4  them up the month before because he had an argument
5  with his mom.  He was prohibited from having them
6  because of his prior conviction.  His mom said come
7  get them.  The only reason that he had them was
8  because his mom said come get them.  He wasn't
9  collecting them but for 30 days because mom said
10 come get him.

11         He -- the nature of his criminal history; we
12 know that this defendant had that prior conviction.
13 And therefore he couldn't have lawfully collected
14 even one gun.  So I'm submitting that with regard to
15 this collection issue, it comes into play only if
16 the Court applies the cross-reference in this case.
17 And if the Court chooses not to do that, the Court
18 -- I'm going to urge the Court to apply Subsection
19 2K2.1(a) sub (4) capital( A).  I'm going to urge the
20 Court to do that because I submit that the Seventh
21 Circuit has already determined in the United States
22 v. Randy Meherg, M-e-h-e-r-g, Meherg, that is
23 located at 714 F.3d 457; that the offense of
24 aggravated stalking under Illinois law is a crime of
25 violence, and therefore, that's the alternative I

1 make.

2      THE COURT:  If we get to that point, you

3 will have time to make further argument on that.

4      MR. MURPHY:  Thank you.  That's our

5 position, Judge.  Thank you.

6      THE COURT:  Okay.  I would like to have

7 argument on the obstruction enhancement that is

8 referenced as obstruction, or objection three,

9 referencing page 20 paragraphs 36 and 42.

10      The defendant objects to the enhancement he

11 received for the obstruction of justice and the

12 information in paragraph 42.

13      And then we will take a break, and then I

14 will announce my rulings, my findings, and then

15 proceed accordingly to sentencing.

16      MR. CHAMBERS:  Your Honor, if I may, the

17 defendant was correctly assessed the two level

18 enhancement increase for obstruction of justice.  He

19 sent two letters to Todd Clayes knowing full well

20 that he was a potential adverse witness.  In those

21 letters, he attempted to influence Clayes to make

22 him unavailable to testify.  He realizes that

23 Clayes's unavailability would increase the chances

24 that the charges against him would not be proven.

25 That's clearly obstructive conduct.  In fact, he was

1  convicted of it.  We believe that the enhancement

2  does apply.  Thank you.

3        THE COURT:  Mr. Vaupel.

4        MR. VAUPEL:  Judge, at the time -- and there

5  is so many papers spread out here.  At the time that

6  the letter was sent, I don't believe that Mr. Clayes

7  had been subpoenaed as a witness, and I don't recall

8  anything in discovery indicating that Mr. Clayes had

9  communicated to Mr. Pollock that he was a witness.

10  I suppose Mr. Pollock could think or assume or

11  whatever, but I don't believe that his letters were

12  obstructing to somebody that he doesn't know is a

13  witness and to somebody who hadn't been subpoenaed

14  by the government or even testified at the state

15  court trial.

16        THE COURT:  All right.

17        MR. CHAMBERS:  I would only say to that that

18  if he didn't think that he was a witness then why

19  did he call him a rat on the jail tapes.  He knew he

20  was a witness.  He knew that he was an important

21  witness for the government.  He was trying to

22  convince him not to testify.

23        THE COURT:  Okay.  Let's take a ten minute

24  recess.  When we come back, I will announce my

25  findings.  Based upon my findings, we will proceed

1  to the appropriate sentencing.  Mr. Pollock will

2  have an opportunity to read his statement after

3  arguments of counsel, but he won't need -- I'll

4  leave it, since we are done with evidence, I will

5  leave it up to the marshals whether they believe

6  that his hands need to be handcuffed or not.  Okay.

7  We will be in recess.

8              (A recess was taken.)

9              (Proceedings were held in open court.)

10         THE COURT:  Please be seated.  Thank you.

11         MR. VAUPEL:  Judge, did the Court receive

12  the letters that we uploaded?

13         THE COURT:  Yes, I did.  They were from

14  Peter Andriotes --

15         MR. VAUPEL:  Okay.  Yes, Judge.  Thank you.

16         THE COURT:  -- Reverend Zehr.

17         MR. VAUPEL:  Zehr.

18         THE COURT:  Those are the two, right?

19         MR. VAUPEL:  Yes.

20         THE COURT:  Okay.  On the first issue of

21  cross-referencing, in the calculations of the

22  guideline levels as pursuant to that, I'm going to

23  find for the government and the probation's position

24  as follows:

25              I'm aware that the defendant was acquitted

1  in state court.  I'm also aware that this
2  cross-referencing can be applied, whether or not a
3  conviction was obtained.  Now having said that, I am
4  -- I would say "cautious" in making some
5  determination when there was a jury verdict on the
6  issue, but I am specifically referencing or
7  referring here to then the point in time where I
8  believe -- and I realize the standard is by
9  preponderance of the evidence, where as the jury
10  verdict would have been beyond a reasonable doubt,
11  and to establish a connection with the commission of
12  or attempted commission of another offense.  I'm
13  focusing solely on the issue of the .45 caliber
14  weapon.  The mention of suicide and what, as my
15  interpretation actually, based on Miss Bowers'
16  testimony, would be that it would be a murder
17  suicide is what it would be because she wasn't
18  agreeable to taking her own life.  I'm not sure
19  frankly, Mr. Pollock would have either, but there
20  can be no question with the belief of Miss Bowyer at
21  that time was that Mr. Pollock could and would do
22  it; that he was capable of doing it.  The restraint
23  of her movement continued throughout this time and
24  at the very least a reasonable inference could be
25  that letting her know what he could do if she went

1  to authorities.  So I believe by a preponderance of
2  the evidence on that issue, the government has
3  prevailed.
4        With regard to the issue of collection, I
5  don't think there is any question about it.  That's
6  not even a close call in my mind.  First of all,
7  Mr. Pollock's prohibited from possessing firearms
8  for any purpose.  You don't -- and then he asked
9  someone to get them and hide them.  The weapons were
10 not in the condition that satisfies me that they
11 were for any lawful sporting purpose or collection.
12 Given the testimony and lack of maintenance, care,
13 oiling, cleaning, stored in the trunk of a car, and
14 the fact that the .45 caliber had a frame made by
15 one company, a slide by a different company, that
16 does not add up to any kind of a legitimate
17 collection.
18       So the finding for the government and
19 probation's position on that.  With regard to the
20 enhancement for obstruction, I think that clearly
21 applies as well and find that the government's
22 position is appropriate.  There I don't think much
23 needs to be said on that other than the jury heard
24 that are one and made that determination beyond a
25 reasonable doubt with their finding.

1    So, with that in mind, the total offense

2 level will start at 40, Criminal History Category

3 will be IV, that would make the guideline provision

4 of 360 to 480 months; however, it is statutorily the

5 maximum sentence on Counts I and II is 120 months

6 and on Count III the statutory maximum is 240

7 months.  Supervised release is one to three years on

8 each of the counts; ineligible for probation; 25,000

9 to $250,000 fine; and a hundred per count special

10 assessment.

11    Given my rulings, do the parties agree that

12 those are the guideline provisions?

13    MR. CHAMBERS:  The government does, Your

14 Honor.

15    MR. VAUPEL:  Yes, Judge.

16    THE COURT:  Given my rulings.

17    MR. VAUPEL:  Given your ruling.

18    THE COURT:  Now for the record,

19 alternatively, had I not made the findings that I

20 made, and had or had -- or if the Seventh Circuit

21 thinks that these findings were not appropriate or

22 at the standard, more specifically, the

23 cross-referencing and I guess the collection issue,

24 although I don't see how that is a close call, but

25 if the Seventh Circuit were to disagree with me, it

1  would be my position that under 2K2.1(a)(4)(A), the
2  base offense level would be 20 because of the case
3  of the United States v. Meherg which was decided
4  April 8, 2013, that one of Mr. Pollock's criminal
5  convictions was for aggravated stalking and that
6  constitutes a crime of violence.  So the base
7  offense level would have been 20.  The number of
8  firearms would have added four to make that 24.  The
9  obstruction enhancement, which I found to be the
10  case, I would find again, would make 26; that would
11  make a criminal history category of IV and a
12  guideline range of 92 to 115 months on each of the
13  three counts.  I will comment on that here again in
14  a few moments.
15          So with that in mind, are the parties ready
16  to proceed to sentencing?
17          MR. CHAMBERS:  The government is, Your
18  Honor.
19          THE COURT:  Any evidence in aggravation from
20  the government?
21          MR. CHAMBERS:  No, sir.
22          THE COURT:  Any additions or corrections to
23  the Presentence Report from the government?
24          MR. CHAMBERS:  No, Your Honor.
25          THE COURT:  Any evidence from the defense?

1          MR. VAUPEL:  Just briefly, Your Honor.

2          Your Honor, I would ask Mr. Begly to

3 testify.

4          THE COURT:  All right.  Come forward please,

5 sir, if you are willing.  Do you want to raise your

6 right hand please.

7          THE WITNESS:  I would like to affirm.

8          (Witness sworn.)

9          THE COURT:  Please have a seat.

10                    VERNICE BEGLY,

11 after having been duly sworn, testified as follows:

12                  DIRECT EXAMINATION

13 BY MR. VAUPEL:

14 Q.  Sir, can you state and spell your name for the

15 record.

16 A.  Yeah.  My name is V-e-r-n-i-c-e, B-e-g-l-y.

17 Q.  Vernice Begly.

18 A.  Right.  I hope that I can hear you.  My hearing

19 aid went out.

20 Q.  You tell me if you can't hear me, okay?

21 A.  Okay.

22 Q.  Sir, do you know Mr. Pollock?

23 A.  Yes.

24 Q.  Did you attempt to send a letter on his behalf?

25 A.  Yes, I did; I sent it.

1  Q.   And that letter got returned somehow?

2  A.   Yes.

3  Q.   What was it that you wanted the Court to know?

4  A.   I just wanted to know that I have known Bill for

5  about, I would say, roughly four to five years.  He

6  has been attending our church at Willow Springs

7  Mennonite Church.

8  Q.   And have you participated in church groups and

9  activities with him?

10 A.   Yes.

11 Q.   And has he often attended services and things

12 like that?

13 A.   Yes.  He attended services very regularly.

14 Q.   Does he contribute to the services or do any

15 sort of, I guess, community service type work for

16 you?

17 A.   I'm -- say that again.

18 Q.   Yes.  Does Mr. Pollock, did he do anything for

19 the church or for the groups?

20 A.   Yes.  We have a -- between Sunday church and

21 Sunday school, we have a fellowship time and

22 Mr. Pollock has regularly brought donuts for that

23 fellowship hour.

24 Q.   Does he participate in the fellowship as well?

25 A.   Yes, he does, uh-huh.

1 Q.   Have you had church group at his house?

2 A.   I attended church at his house one time.  We had

3 Bible study there and another gentlemen and I went

4 and attended there.  Just one time we did that.

5 Q.   Okay.  And --

6        MR. VAUPEL:  No other questions.  Thank you,

7 sir.

8        THE COURT:  Hold on one second, sir.  One

9 second.

10        Any questions?

11        MR. CHAMBERS:  No questions.

12        THE COURT:  Okay.  You may step down.  Thank

13 you, sir.

14        MR. VAUPEL:  Judge, I call Mark Grabbe.

15                MARK GRABBE,

16 after having been duly sworn, testified as follows:

17                DIRECT EXAMINATION

18 BY MR. VAUPEL:

19 Q.   All right.  Can you state and spell your last

20 name for the record?

21 A.   Mark Grabbe, G-r-a-b-b-e.

22 Q.   And, sir, do you know, Mr. Pollock?

23 A.   Yes.

24 Q.   How long have you known him?

25 A.   I've probably known Bill 40 years.

1  Q.   Okay.  And what kind of a person do you know
2  Bill to be?
3  A.   Me and Bill always gotten along real good.  We
4  have been good friends for, like I say, 40 years.
5  Q.   And has Bill ever helped you out with the things
6  that you need?
7  A.   Oh, yeah, yeah, mechanical stuff.  He's worked
8  on my cars for me.
9  Q.   Has he gone out of his way to help you with
10 either the cars or anything else that you might need
11 as a friend?
12 A.   Yeah.  You know, Bill is one of those guys that
13 I can count on if I needed something.  Yeah, I could
14 ask him for it.
15 Q.   And as far as Charles' work, what -- do you know
16 what he did?
17 A.   He did a lot of junking cars.
18 Q.   And is that out there in the country in rural
19 Knox County?
20 A.   Yeah.
21 Q.   Had he pretty much always worked as far as you
22 know?
23 A.   Yeah, yeah.  You know, he usually didn't have a
24 9:00 to 5:00 job but he worked, he junked cars.
25 Q.   Okay.  And then finally, sir, my last question

1   is having known Charles for this long, do you

2   consider him to be violent or anything like that?

3   A.   I've never seen Bill throw a punch, never.

4          MR. VAUPEL:  No other questions.

5          MR. CHAMBERS:  No questions, Your Honor.

6          THE COURT:  You may step down.  Thank you.

7          MR. VAUPEL:  Judge, one last witness.

8                    JEFFREY AINLEY,

9   after having been duly sworn, testified as follows:

10                  DIRECT EXAMINATION

11  BY MR. VAUPEL:

12  Q.   Sir, can you state and then spell your name for

13  the court reporter?

14  A.   Jeffrey D. Ainley, A-i-n-l-e-y.

15  Q.   Sir, do you know Mr. Pollock?

16  A.   Yes, I do.

17  Q.   How do you know him?

18  A.   I've known him since back in grade school, third

19  grade, a lot of years.

20  Q.   And have you had regular contact with him over

21  the years?

22  A.   Oh, yes.  We were close friends for a very long

23  time and still are.

24  Q.   Okay.  And what kind of person do you know

25  Charles to be?

A.   Very kind and loving guy.  I mean, he's the type
of guy that will give you the shirt off his back if
that's what you needed.  He'd take you in and give
you a place to stay if you need it.

Q.   Has he ever helped you out that way?

A.   He's given me jobs to help him that I make money
when I needed to make money.  Like I said, close
friend and willing to do whatever he can to help a
friend out.

Q.   And now prior to his arrest, was he operating a
junk yard?

A.   Yes, he was doing scrapping.

Q.   And do you know had Charles worked pretty
consistently throughout his adulthood?

A.   Yeah.  Like Mr. Grabbe said, not a 9:00 to 5:00.
He worked at Pines for a while and that, but he's
more of an outdoor person rather than be trapped in
a factory, that's where his scrapping business did
better for him.

Q.   Do you know Charles to be a violent person?

A.   No, I do not.  I know him to avoid situations
where there is going to be trouble if he knows that
it is coming.

Q.   Sir, my last question is, as it relates to
whether it is church or community, are you aware of

1  Charles ever donating his time or money or efforts
2  towards the church or the community?
3  A.   He's made mention of it when he's stopped by my
4  place.  He knows that I've given my heart to the
5  Lord as well, you know.
6  Q.   Do you attend the same services that Mr. Pollock
7  does or different church?
8  A.   I do not attend said church.  I don't have an
9  organized religion.  I believe in the Lord, the
10  Bible and what it says and I interpret it for what
11  it does say.
12          MR. VAUPEL:  No other questions, Judge.
13          MR. CHAMBERS:  No questions, Your Honor.
14          THE COURT:  You may step down, sir.
15          No further evidence.
16          MR. VAUPEL:  Judge, I don't have any further
17  evidence.  Of course, Mr. Pollock wishes to give a
18  statement of allocution.
19          THE COURT:  Okay.  Arguments as to
20  sentencing alternatives.
21          Let me ask first this, Mr. Vaupel, has the
22  Court considered all of the objections that you have
23  made?
24          MR. VAUPEL:  I believe so.
25          THE COURT:  Okay.  Argument as to sentencing

1  alternatives.

2         MR. CHAMBERS:  Thank you, Your Honor.

3         May it please the Court, counsel.

4         I would submit to the Court that you have

5  sitting before you Mr. Pollock, a dangerous man.

6  Directing the Court's attention to paragraph 63 of

7  the Presentence Report, on page 16 there, after exam

8  it was written that he has an inflated sense of his

9  own importance and does not cope well with authority

10  figures.  A person who is likely to challenge

11  authority because of the excitement that it creates

12  for him.  Diagnosed with Adjustment Disorder with

13  Conduct Disturbance and Narcissistic Personality

14  Disorder.  He does not sense any emotional or

15  psychological discomfort.  He sees his conflicts

16  with other people as being created by them and he

17  sees no reason to change.

18         Your Honor, I think that you have seen that

19  throughout the trial and throughout the sentencing.

20  That's exactly what we have in Mr. Pollock.  His

21  prior criminal history, although not lengthy, does

22  show exactly that.  The prior violent conviction for

23  aggravated stalking, the violence you've heard about

24  today against Kim Bowyer, the attempt to obstruct

25  this proceeding by attempting to keep a witness from

```
 1  testifying, the threat with the .45, all of the
 2  firearms and we still think about that missing AK 47
 3  where we found the magazines in a sock drawer.
 4  We've never found the AK 47.
 5          Your Honor, for all of these reasons we
 6  believe that an appropriate sentence is the sentence
 7  that you can hand down of 360 months.  As an
 8  alternative, if I understand correctly, the range is
 9  92 to 115?
10          THE COURT:  Yes.
11          MR. CHAMBERS:  And I believe it would be
12  appropriate --
13          THE COURT:  I made the alternative finding
14  as to not finding him -- the government's position
15  as to the cross-reference issue.
16          MR. CHAMBERS:  Your Honor, we believe that a
17  sentence at the 360 months is the appropriate
18  sentence to make.  Thank you.
19          THE COURT:  Mr. Vaupel.
20          MR. VAUPEL:  Judge, I don't know that I've
21  ever in my career handled a case in which somebody
22  is eligible for probation, but the top end of the
23  range is something along the lines of 40 years.  And
24  that wide availability of sentences is what I would
25  ask the Court to exercise its discretion on and use
```

1   despite the fact that the Court did find the
2   cross-reference.  When you look at Mr. Pollock, for
3   the majority of his life there is a lack of
4   criminality, and even this aggravated stalking
5   charge over-represents the seriousness or that
6   charge over-represents the seriousness of his
7   criminal history.  Even though we are aware of the
8   Meherg case and other cases like it, Mr. Pollock's
9   underlying conduct was not violent and the Court
10  should exercise its discretion and not sentence him
11  as though it was.

12          We do often know that Mr. Pollock has worked
13  consistently throughout his life.  He has been a
14  long time member of a church.  His friends who have
15  known him for 40 years or so state that they don't
16  believe that he is a violent person or at least have
17  never seen it.  His friends and people that he
18  attends services with, that he regularly attends, he
19  even has had church group at his own home which is
20  an incredible juxtaposition with what we heard
21  earlier from Miss Bowyer.

22          Judge, we feel that in this particular case
23  Mr. Pollock was found guilty of possession of these
24  weapons and of the obstructing charge.  And we would
25  ask the Court to sentence him to a sentence that is

consistent with that and without the consideration
of the prior violent offense of the aggravated
assault.  And so we'd ask the Court to sentence
Mr. Pollock to two years.  We understand that that
is an incredible departure from what the sentencing
guidelines state or from what the cross-reference
would be.  However, that is the sentence for the
crime that he committed aside from these other
sentencing factors.

THE COURT:  Thank you, Mr. Vaupel.

Mr. Pollock, at this time you have an
opportunity to make a statement if you wish.

THE DEFENDANT:  Yeah, I would like to read
this, Your Honor.

THE COURT:  Go ahead.  You can do it from
there or your seat, wherever you want.

THE DEFENDANT:  First of all, I would like
to say that I don't feel any statement that I make
is going to carry any weight in your courtroom.
But, you know, I have been in jail over there for
two years based on false and contradictory
statements that are contained within themselves in
court transcripts.  I proved this at a jury trial
when I beat 18 charges.  I believe Detective Kraemer
willfully negligently omitted facts to obtain an

arrest from a search warrant.  They arrested me for
stealing a truck, vandalizing a truck, stealing the
contents of the truck.  There is no proof of any of
that.  These are neither accusations made by one
woman that there is no proof of.  They got a search
warrant based on the fact she is saying that I stole
this stuff out of her truck.  Even if they would
have found this merchandise at my house, there is no
proof that it was ever in the truck.  There is just
no proof.

I believe that you've called me in this
courtroom a violent and defendant -- a violent and
dangerous person.  These accusations that you made
about me are based on the information that has been
provided you, first of all, through my rap sheet,
and a rap sheet on there said that I was in prison
in Joliet which is a total falsehood.  It's never
happened.  It said I was charged and convicted of
illegal use of a firearm which has never happened.
And, like I say, it is just misleading.

But these are presented evidence, you know,
here in the federal system against me.  You know, I
could present some documents about the false
contradictory, you know, and the contradictory and
the statements made by Kim Bowyer and Shandel

1  Henderson.  If you look at the Presentence Report on
2  page five paragraph eight, it states reports from
3  Williamsfield PD, Knox County Sheriff's Department,
4  Department of Justice, Bureau of ATF & Explosives.
5  All of these reports come from alleged accusations
6  made by Kim Bowyer.  There is no one to corroborate
7  this.  If you go to page 5 paragraph 10, it says
8  that there is an existing history of verbal and
9  physical abuse.  This is one of many bare bone
10 statements that Miss Bowyer has made.  There is no
11 adjudicated history of it.  It just didn't happen.
12 It is more falsehoods.
13      And in paragraph 11 it states that Shandel
14 Henderson advised officers that I came to the
15 residence and forcefully took Kim Bowyer against her
16 will.  I forcefully put her in my vehicle against
17 her will.  Shandel Henderson's written statement,
18 which I have marked for Exhibit B for my own
19 records, it fails to state anything about kidnapping
20 or forcing her mother, Kim Bowyer, into my vehicle
21 against her will.  It just doesn't say that in her
22 statement.
23      Shandel Henderson states that she never seen
24 her mother leave.  That is in Exhibit B.  Shandel
25 Henderson states she only seen my vehicle leave.

1 Under oath she stated these things.

2        And these things that she stated, they are

3 contradictory to the reports stating that I forcibly

4 took her mother.  On page 345 of the Knox County

5 transcript, Shandel Henderson states under oath that

6 she was in her house and didn't see anything.  When

7 she was confronted with these false accusations in

8 Knox County Court, under oath, she said, my mother

9 told me what to say.  That's page 345 of the trial

10 transcripts.  My mother told me what to say.

11        Kim Bowyer told Shandel Henderson what to

12 say makes the statement unreliable.  They are so

13 unreliable it is not even funny.  There is no proof

14 to anything she said.

15        Again, Shandel Henderson states under oath

16 on page 323 talking everything over with her mother.

17 Again, this just makes the statements unreliable.

18 Even if you find them unreliable that doesn't make

19 them credible.  That doesn't make them fact.  It

20 just don't meet the standard of proof.  When you've

21 got one woman telling her daughter what to say in

22 court that is a lie, how can you sentence me on

23 that?  These statements themselves contain many

24 inconsistencies and false statements from the

25 testimony and you sentence me on that.  You sentence

1 me on police reports that you are deeming reliable
2 that we already proved the reports that have been
3 presented here such as my rap sheet and the addendum
4 to them that says I use and carried a firearm during
5 the possession of a crime.  These are all misleading
6 statements.  They are inaccurates (sic).  There is
7 no truth in them.
8      Kim Bowyer states that I tell Shandel
9 Henderson to get in the house.  I push Shandel
10 Henderson.  Shandel Henderson says that I never
11 physically touched her or her mother.  At this point
12 the judge stops the trial there and he drops the
13 domestic battery.  He says, you mean, he's never
14 touched or pushed her.  Shandel Henderson:  He's
15 never touched me.  And yet the mother says that I
16 pushed her and they are charging me with this.
17      My attorney on page 138, my attorney asked
18 Kim Bowyer, did Bill ever hit, slap, push or hurt
19 Shandel in any way.  Kim Bowyer answers, no.  This
20 is just another contradictory to what she wrote in
21 her statement.  My attorney asked me if I have any
22 records.  Kim Bowyer says no.  My attorney confirms
23 Kim Bowers' answers.  No threats.  No weapons.  No
24 guns.  No nothing.  Kim Bowyer answers no to all
25 three questions.  This is clearly contradictory to

what Kim Bowyer's report says and what she told
officers.  These contradictions bring her
credibility into question.  Kim Bowyer's written
statements that after I take a shower she says that
I'm at my house, I agree to take a shower, and then
in Court she says I never took a shower.  I did take
a shower.  While I was in the shower, she is using
my phone.  I have phone records to document that.
She used my phone.  She is calling her daughter.
She called her daughter I believe five times that
night.  One conversation was quite lengthy.

        Kim Bowyer states, upon arrival at my house,
I lock the doors and close the windows and the
blinds.  When questioned by my attorney about the
blinds and the windows, the blinds were shut.  Yes,
the windows were shut.  Yes.  Officer Quinn states
that he sees this and I stand up and shut the window
and the blinds.  This is just another one of her
inconsistencies.  She says I shut the windows and
blinds.  The cop's at my house.  He says they are
open.  Clearly, she is lying in her statements and
under oath.

        Officer Jennings said that he looked in the
window and seen Kim Bowyer sitting on my lap.
Obviously the blinds got to be open for him to see

1  this.  At trial he testified that he is within 18

2  inches of us.  He further states that Kim Bowyer

3  isn't crying, hurt, or being held or being

4  restrained in the fetal position.  Now you just

5  heard Miss Bowyer testify that I have got her held

6  in the fetal position restraining her.  The police

7  officer looks in my window.  He says, no I don't see

8  none of this.  Obviously, obviously, somebody is

9  being pretty untruthful here and I don't think it is

10  the police officer.

11       She states under oath she's being held in a

12  baby position.  The blind's closed and no one can

13  see us.  She can't move or breathe.  That's clearly

14  contradictory to what the officer saw, Your Honor.

15  The officer didn't arrive at my house until two

16  hours after she alleges that I kidnapped her.

17  Surely if I was going to rape her or torment her or

18  torture her, why would I wait two hours?

19       Kim Bowyer states that she's dragged by the

20  hair of the neck, kicked in the face, has a swollen

21  lip, pushed around and raped.  At this point she's

22  talked to numerous officers.  I believe five

23  altogether if not six.  She's talked to the state's

24  attorney and no one makes a record or any

25  photographs of any injuries.  I find that odd.  If

1 I'm dragging you by the hair and the neck, kicking

2 you in the face and raping you, you should have a

3 broken fingernail or a scratch or a bruise.

4      On page 6 of paragraph 13, I allegedly

5 forced Kim Bowyer to have sexual intercourse.

6 Again, there is no evidence.  There is no rape test

7 kit done.  No hospitalization.  There is no

8 injuries.  Kim Bowyer says that she is too

9 embarrassed to go tell the doctors about this rape

10 but she can make numerous police reports which I

11 have a stack of.  So she can go tell all of those

12 cops I've kidnapped and raped her, yet she is too

13 embarrassed to tell a doctor.

14      On page 205, states that these complaints of

15 kidnapping and rape couldn't be verified.  They are

16 not even verified.  That's already in the record;

17 they can't be verified.  This is further proof of

18 more false statements.

19      On page 100, Kim Bowyer tells Officer

20 Davidson she talked with me one or two times from

21 7/10 to 7/16.

22      On page 102, Kim Bowyer states no contact

23 from the 10th to the 16th.  I have got the phone

24 records.  She called me 43 times.  Is that no

25 contact?  Some of the calls lasting over 15 minutes;

1  43 times in 6 days.  She has called me every hour.

2  She says that she has had no contact with me, right

3  she says that; no physical act.

4       On the stand Kim Bowyer, page 202, Kim

5  Bowyer states that we had sex the day before all

6  this happened, which would have been the 16th.

7  Wouldn't that be contact?  She just testified she's

8  had no contact.  Knox County transcript, she says

9  that we had sex the night before.  Obviously, she is

10  lying on the stand.

11       Kim Bowyer's statements to Officer Davidson

12  are inconsistent with her testimony under oath.

13  Officer said they picked up Kim Bowyer at 3:06 a.m.

14  walking in the road, Your Honor.  She said -- she

15  told Officer Davidson I kicked her out of the

16  vehicle, told her to find her own way home.  That's

17  written in her police report.  Now she sits up here

18  and says I'm flirting with girls and she's decided

19  to leave me.  She did leave me at about 9:30 that

20  night.  The officers pick her up at 3:06 in the

21  morning walking down the road not a block from where

22  she says I left her.

23       THE COURT:  Mr. Pollock, I think that you

24  wrote that fully intending or expecting me to have

25  retried your state court case and --

```
 1            THE DEFENDANT:  No, no --
 2            THE COURT:  -- I get the impression that you
 3   are frustrated because all of the things that you're
 4   saying, which you may believe, I didn't even make
 5   rulings on or findings on.
 6            THE DEFENDANT:  That's fine.
 7            THE COURT:  I didn't adopt that testimony.
 8            THE DEFENDANT:  I'm trying to point out --
 9            THE COURT:  I made it very clear why I ruled
10   the way I ruled and I made it very clear at the
11   point where I determined the conduct to occur to
12   make to cross-reference.
13            THE DEFENDANT:  I would like --
14            THE COURT:  If you wish to retry your state
15   case through your own statement and testimony, I
16   have got nowhere to go.  We will sit here as long as
17   it takes, but we are going to get to your
18   sentencing.
19            THE DEFENDANT:  Okay.  I'm just trying to
20   point out these inconsistencies.
21            THE COURT:  I understand.
22            THE DEFENDANT:  She is saying one thing in
23   the written statement; she is testifying to another.
24            She says at 3:06, the police officer says
25   that he picked her up walking in the roadway.  At
```

3:02 in the morning --

     THE COURT:  Just clue me in on how much more you have so that I can decide whether we are --

     THE DEFENDANT:  Okay.  I won't read it.

     THE COURT:  No, you can read them.  I'm just curious so that I know when to break to give the people in the courtroom --

     THE DEFENDANT:  If you don't want me to read them, I won't read them.

     THE COURT:  Okay.  Is there --

     THE DEFENDANT:  If that's how you want it, that's how you have it.

     THE COURT:  That isn't want I said.  Is there anything --

     THE DEFENDANT:  Yes, you did.

     THE COURT:  Well, again, Mr. Pollock, you hear what you want.  Do you have anything else to say?

     (A pause was had in the record.)

     THE DEFENDANT:  Yeah.

     THE COURT:  All right.

     THE DEFENDANT:  Yeah, this case -- the fruit of this case comes from a poisonous tree. Everything that Kim Bowyer has said is false, Your Honor.  If she would have never made these false

1  statements; it would have never happened.

2       I'd like to say too that I have never even

3  heard of a constructive possession law of a firearm

4  or drug or anything else.  I have never even heard

5  of that law.  I'm a pretty law abiding citizen.  If

6  you look at the PSR you can see that.  My intentions

7  were never to break no law.

8       The problem that I run into here is after

9  they put an order of protection on me, I did give my

10  guns to my mother because when the order of

11  protection is over, I can get these guns back

12  legally and possess my old junky guns that I have.

13  All I have is a bunch of old junk stuff and liked it

14  and I collected it.  It is called antiques.  The

15  problem is when I become a convicted felon there is

16  no way for me to legally liquidate these assets.

17  The law has provided no way out for me.

18       Kim Bowyer says that I go get a bag of pot.

19  I'm on mandatory urinalysis.  Why would I buy a bag

20  of pot?  She said that on the stand just here.  I

21  would like to say that Kim Bowyer has done this to a

22  string of men.  I'm like the fifth guy she's tried

23  to put away.  The last guy I believe she had charged

24  with attempted murder.  He beat all of his charges

25  too, Your Honor.

1      As far as the aggravated stalking goes, I

2 would like you to know that I lived with that woman

3 for 22 years and you can check the PSR.  I had no

4 crimes at that time.  No charges brought against me.

5 Nothing at all.

6      When she left me, she took a substantial

7 amount of money.  I was trying to recover some of

8 that money.  I never grabbed her.  I never touched

9 her.  I never physically hurt her.  I never threw

10 rocks at her.

11      Aggravated stalking is because her friend

12 called me and I basically said, you think I'm going

13 to go crazy I and kill her.  I had no idea this

14 friend was going to go tell her I said I'm going to

15 go crazy and kill her.  It is a violent crime but

16 there was no violence in it.  This is a statement I

17 made to one of her friends.

18      That's all that I have got to say, Your

19 Honor.

20      THE COURT:  Okay.  The Court having

21 considered the information before it.  The

22 Presentence Report is prepared by probation which

23 includes sentencing guideline calculations, the

24 defendant's commentary on sentencing factors, and

25 the attachments, letters from individuals, the

1  government's commentary, the arguments of counsel,
2  the statement of Mr. Pollock, the factors as set
3  forth in 3553, which include the nature and
4  circumstances of the offense, the history and
5  characteristics of the defendant, the need for the
6  sentence imposed to reflect the seriousness of the
7  offense to promote respect for the law and provide
8  just punishment for the offense, to afford adequate
9  deterrence to criminal conduct, to protect the
10 public from further crimes of the defendant, and to
11 provide the defendant with educational or vocational
12 training, medical care or other correctional
13 treatment in the most effective manner.  I believe
14 that after factoring all of these matters that this
15 sentence is sufficient but not greater than
16 necessary to comply with the purpose of the Act.
17         Now 5K2.9 sets forth the criminal purpose:
18 committed the offense in order to facilitate or
19 conceal the commission of another offense.  I
20 believe that's the case here.  When the defendant
21 was under federal indictment for Count III -- was
22 under federal indictment for Counts I and II when
23 Count III was committed and the enhancement for the
24 level for obstruction of justice, the two point
25 enhancement, I don't think adequately accounts for

the nature and circumstances of the offense, so

therefore a consecutive sentence, I believe, is

necessary as to Count III.

        Now, if I were to sentence Mr. Pollock

alternatively, as I said, for the record --

Mr. Vaupel, do you want to be heard?

        MR. VAUPEL:  I'm sorry, Judge, Mr.

Pollock -- I didn't realize that he had -- he wishes

you to consider his certificates from his Bible

courses as part of the record.

        THE COURT:  Why don't you just tell me what

they say; give me an offer of proof.  How many are

there?

        THE DEFENDANT:  153, Your Honor.

        THE COURT:  All right.  Did you just provide

those to Mr. Vaupel?

        MR. VAUPEL:  Yes, Judge, just now.  That

certify that he successfully completed the Servant

of God correspondence courses.

        THE COURT:  I will consider them as you

represent them that there are 153 certificates.

        THE DEFENDANT:  All of these ones I have

from completions of the course.  I have got some of

these in excess of 6, 7, 800 hours in these

certificates.

1     THE COURT:  All right.  And I will consider
2  that as represented by you and by Mr. Vaupel, but
3  I'm not going to now at this point in the proceeding
4  read each of those.  And I would say that it as
5  commendable as that is, and clearly that sets forth
6  a good character trait on your behalf, it would not
7  affect the sentence I'm about to impose.
8     Now I was going to say that alternatively,
9  if I had just found against the cross-reference and
10 for the gun and on the gun issue and then establish
11 the guidelines accordingly, the guideline range
12 would have been 92 to 115 months.  I would have
13 imposed 115 months on Count I and II concurrent, and
14 because I believe a consecutive sentence is
15 necessary, as I just stated, I would have imposed a
16 115 months consecutive on Count III, consecutive to
17 Counts I and II.  But I'm not sentencing you in that
18 regard.  I'm sentencing you for -- alternatively
19 under the findings that I made that cross-reference
20 the specific Act of the .45 caliber and request to
21 commit suicide in the commission of or continuing
22 commission of the offense.  And, therefore, the
23 ranges are, as I set forth earlier, 120 months as to
24 Counts I and II statutorily and 240 months as to
25 Count III.  I am not going to adopt the complete

1  position of the government, but I am going to adopt

2  a portion of that position.

3          Now, as I said earlier, Mr. Pollock, you are

4  -- believe that you are being singled out for

5  everything because of Kim Bowyer.  The fact that you

6  are being sentenced for the guns, the ammunition,

7  and for the tampering with the witness has little to

8  do with Kim Bowyer and everything to do with you.

9  The finding that I made cross-referencing the case

10  has to do with Kim Bowyer in the sense that she was

11  under your control when that threat or request to

12  commit suicide together was made, if you want it put

13  that way.

14          So, it will be a sentence to the Bureau of

15  Prisons for Counts I and II for a period of 120

16  months to be served concurrently.  That is the

17  maximum sentence that can be imposed on Counts I and

18  II unless I were to run them consecutively which I

19  am not.

20          But Count III is to be run consecutively and

21  it will be for another 120 months.

22          So that will be a sentence of -- total

23  sentence of 240 months in the Bureau of Prisons.

24          You will be serving a term of three years on

25  each count of supervised release to be served

1  concurrently.

2        I will find that you do not have an ability
3  to pay a fine, so no fine is imposed.

4        I did not reference Mr. -- as Mr. Chambers
5  did, but I do think that anything more that needs to
6  be said about you is set forth in paragraph 63,
7  Dr. Olms' characterizing of you that Mr. Chambers
8  referred to.  It is conduct that is abundantly clear
9  by spending any amount of time with you as we have.

10       Within 72 hours of your release, not commit
11 -- you will serve those terms of supervised release
12 while on -- you will report and serve those terms
13 while on supervised release.  Not commit another
14 federal, state or local crime.  Not possess a
15 controlled substance.  Submit to drug testing as
16 directed, and cooperate in the collection of DNA.

17       You will refrain from any use of alcohol and
18 not purchase, possess, use, distribute or administer
19 any controlled substance or mood-altering substance
20 or any paraphernalia related to except as prescribed
21 by a physician.

22       Not own, purchase or possess a firearm,
23 ammunition or other dangerous weapon, not even for
24 collection purposes.

25       A special assessment of $300 is imposed

1  payable immediately.

2          Recommend you serve your sentence in a

3  facility as close to your family in Kewanee,

4  Illinois as possible.  And in a facility that will

5  maximize your exposure to educational and vocational

6  opportunities if you choose.

7          Is there anything else before appeal rights?

8          MR. CHAMBERS:  Nothing from the government,

9  Your Honor.

10          THE COURT:  You do have appeal rights.  And

11  if you are unable to afford an attorney one would be

12  appointed for you.  You have 14 days to appeal or

13  ask Mr. Vaupel to do so on your behalf.

14          Anything else before we recess?

15          MR. CHAMBERS:  Nothing from the government,

16  Your Honor.

17          THE COURT:  All right.  Thank you.  We will

18  be in recess.

19          (Which were all of the proceedings had in

20          this case on this date.)

21                    *****

22      I certify that the foregoing is a correct
   transcript from the record of proceedings in the
23  above-entitled matter.

24
   s/Nancy Mersot          Date:  September 9, 2013
25  Court Reporter